**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

-------------------------------------------------------------X

ASHLEY OGEDEGBE,                   :

                                    :

                 Plaintiff,     :     Civil Action No.:

                                    :

       v.                       :

                                    :     **COMPLAINT**

MCDERMOTT WILL & EMERY LLP; and JOHN   :

DOES 1-10                         :

                                    :     **Jury Trial Demanded**

                 Defendants.     :

-------------------------------------------------------------X

Plaintiff Ashley Ogedegbe, as her Complaint against Defendants McDermott Will & Emery LLP ("MWE," or the "Firm") and John Does 1-10 hereby alleges as follows:

## PRELIMINARY STATEMENT

1. On Ms. Ogedegbe's very first day at MWE, she was supposed to meet a member of Human Resources ("HR") to give her a tour of the office. The HR representative never showed up, so instead she was given the tour by a Black receptionist who delivered an ominous message: **"Black women don't last at the Firm."** Unfortunately, it did not take long for Ms. Ogedegbe to discover why.

2. Indeed, during her very first week at MWE, Ms. Ogedegbe – an experienced lawyer who has received various plaudits – including being named to the National Black Lawyers Top 40 under 40 list, as well to the Top 10 under 40 Florida Health Law Section of the Florida Bar – experienced egregious and open racism firsthand.

3. It was at an Associate retreat in November of 2022. One of the events offered during the retreat was a diversity and inclusion program led by a Black woman presenter.

4.     During the program, the presenter asked the Associates in attendance to provide answers to questions such as, "what do you hide about yourself at work" and "what are you most proud of."

5.     The answers were electronically displayed on a large screen set up behind the presenter, for all of those in attendance, including Ms. Ogedegbe, to see.

6.     To her shock and horror, multiple egregiously racist and antisemitic comments were put up on the screen, with some Associates answering these questions with references to **"white pride," "white skin," "white power"** and **"Nazism."**

7.     The fact that these comments were made is abhorrent in itself, but even more so because they were made at a diversity and inclusion program – a blatant attempt to threaten and intimidate a disproportionately minority audience.  Indeed, the Associates hid behind their ability to post these statements anonymously.

8.     Incredibly, the Firm did virtually nothing to address this brazen demonstration of racism.  Although it would later claim that Firm Chairman Ira Coleman condemned the behavior the next day: (i) it is not clear that this actually occurred; and (ii) if it did occur, it occurred at a nonmandatory meeting that was poorly attended.

9.     There was never any training directed at the behavior, no remedial action was taken and, despite claiming that it would "engage all employees in professionally moderated small group discussions aiming to help bridge differences through the sharing of personal experiences," this simply never occurred.

10.     When one of Ms. Ogedegbe's former colleagues pushed for Firm leadership to issue a formal written apology and conduct an investigation, she was directed not to discuss the matter further and terminated shortly thereafter.

11.     The Firm has consistently weaponized its HR department as a shield against accountability, conducting sham investigations to conceal the truth. Instead of addressing legitimate complaints of discrimination, the Firm has systematically misled its victims, withheld critical information, and manipulated the process to protect the Firm.

12.     As Ms. Ogedegbe would learn over the following years, the display of racism at the November 2022 Associate retreat, while perhaps the most explicit, was far from unusual at the Firm.  Indeed, from the top down, the Firm has shown a remarkable apathy for hiring, developing, retaining and promoting people of color, even while it tells the outside world that it is committed to racial diversity.[1]

13.     To that end, of the Firm's approximately 700 Partners, only 22 (3%) are Black, and only 9 (1.2%) are Black women.  The numbers at the Associate level are not much better, but they are somewhat better, indicating that Black attorneys are underrepresented at the Partner level even as compared to the already dismal representation at the Associate level.  This is illustrative of the fact that Black Associates are discriminated against, are not mentored, are provided fewer opportunities for career development and, as a result, "don't last at the Firm."

14.     The Firm does not have a single Black female Capital Partner, after it pushed out its only Black female Capital Partner in 2024.

15.     Moreover, there is not one Black person among the Firm's Chairman, Chief Operating Officer, General Counsel, Deputy General Counsels, Chief Financial Officer, Chief

---

[1]     In 2021, MWE issued a press release, which it has since been removed from its website, celebrating itself for being Mansfield certified.  This press release was reposted on X/Twitter, LinkedIn and every other public marketing channel in an effort to attract diverse candidates and lead clients to believe that diversity existed at MWE. MWE continued to issue similar press releases and statements about its Mansfield certifications up until as recently as late last year.  These press releases and statements have been scrubbed from MWE's websites and social media, likely because the Firm is gutlessly cowering in fear in response to President Trump's attitudes towards Diversity, Equity and Inclusion.

Business Development and Marketing Officer, Chief Knowledge Officer, Chief Human Resources Officer, Chief of Administration or Chief Strategic Counsel.

16.     10 out of the 11 (91%) persons making up the leadership team are white. The only Black member of the leadership team, Anthony Upshaw, is the Head of Diversity, a concept for which the Firm has very little regard.

17.     The few Black lawyers that the Firm does employ are relegated to token status and regularly disregarded when they are not being used to try to convince clients and the outside world that the Firm is diverse.

18.     For example, the position that Ms. Ogedegbe took was advertised as being open to all MWE offices (and even remote). However, when Ms. Ogedegbe was hired, her request to work in Florida was denied, despite the job description promoting availability in Miami and her passing the Florida bar a year earlier in 2021. She was told that she had to work from the Chicago office under the false pretext that most of the Digital Health team that hired her was based in Chicago. In reality, the Firm wanted Ms. Ogedegbe in Chicago because it had no Black female attorneys in Chicago, which was hurting its recruitment and client development efforts. To that end, Ms. Ogedegbe was included in client pitches to help the Firm appear diverse but then given no work when the Firm was retained.

19.     The Firm did not even send out a welcome email in connection with the start of Ms. Ogedegbe's employment until four months after she started. Various non-Black Associates who were hired after Ms. Ogedegbe had their welcome emails sent out before hers. When she initially started, they gave her an office typically reserved for a secretary. When Ms. Ogedegbe was finally permitted to move to Miami, a Senior HR Manager misspelled her name on the

transfer form, provided the wrong office number in the internal announcement – in fact, the identified office was empty –and announced her arrival on the wrong day.

20.     Oftentimes the Firm could not even keep its own Black lawyers straight.  By way of example, Ms. Ogedegbe was asked to write, present and publish an article.  Incredibly, when the article was published, the Firm failed to include Ms. Ogedegbe's name and instead mistakenly included the name of a totally different Nigerian Associate who worked out of the D.C. office.  There is no more egregious example of the "all Black people are the same" attitude at the Firm than this.

21.     As described in detail herein, the aforementioned examples barely scratch the surface.  Throughout her time at the Firm, Ms. Ogedegbe was subjected to blatant and consistent discrimination, including, but not limited to, disparate work allocation and opportunities, exclusion from important trainings, meetings, phone calls, conferences, etc., discriminatory appropriation of Ms. Ogedegbe's work and the list goes on.

22.     Most frustratingly, there were multiple occasions when Ms. Ogedegbe's outstanding work led to clients giving the Firm a mandate for more work, which Ms. Ogedegbe was excluded from.  To make matters worse, in one case the white lawyers who were given the fruits of Ms. Ogedegbe's labor performed so poorly that Ms. Ogedegbe had to correct their work, but only from behind the scenes.  On another occasion, Ms. Ogedegbe was told that she was going to need to be the "fall person" after a white income Partner made various mistakes.

23.     The discrimination faced by Black lawyers, and Black female lawyers in particular, was well known at MWE.  Throughout her tenure with the Firm, Ms. Ogedegbe also became aware of multiple other Black female lawyers who also were discriminated against, most of whom ultimately left or were terminated.  Several of these Black women confided in Ms.

Ogedegbe and others. Even the Firm's Diversity and Inclusion Director expressed her frustration that the Chicago office was continuing to exhibit exclusionary behavior towards Black lawyers.

24.    Despite facing a constant barrage of discrimination and inequality, Ms. Ogedegbe's performance was outstanding, which was acknowledged in her performance reviews and various communications right up until her unlawful termination. Examples include, *inter alia*:

- There have been several instances where Ashley produced high quality work product.

- She is also highly responsive and delivered the work on a tight timeline.

- Ashley is doing a strong job as the associate managing transactions for a PPM client. She moves the process along seamlessly, is super responsive, and her work is always timely and client-ready.

- Ashley's questions are thoughtful and she's great at managing teams– subject matter specialists and a paralegal have all reached out to comment on how great it is to work with Ashley.

- Ashley did an excellent job stepping in on short notice in the middle of a very large and complex transaction where she served as the lead associate on the transaction. She did great at researching regulatory schemes and managed a team of specialists and associates on due diligence and ancillary transaction documentation. She stayed organized, was timely, and worked closely with the client over several months to close the transaction

- Ashley has demonstrated excellent project management skills with limited supervision.

- Ashley has an excellent handle on corporate practice of medicine matters.

- Ashley has demonstrated excellent skills in drafting physician practice management agreements.

- On a complex transaction, Ashley provided excellent leadership of the diligence team that was comprised of Partners and Associates.

- Ashley has been a significant contributor to the digital health practice.

- Quietly steady. Well-organized. Trustworthy. Excellent writer and communicator. I really appreciated how she took on a huge role for a major transaction in her first days with the firm and was unafraid to set deadlines and communicate expectations in a clear and supportive way.

- August 3, 2024, Partner Greg Fosheim, "Thanks, Ashley. I am happy to submit a glowing evaluation for you. You've been a valued colleague this year – and [for] several years now."

- October 9, 2024, Partner Jamie Gelfman, describing Ms. Ogedegbe's work product as "perfect."

- January 1, 2025, Partner Danielle Golino, "You[r] comments to [documents] look great!"

- February 16, 2025, Mr. Fosheim, "From my perspective you are doing everything right to make my review as easy as possible."

- February 21, 2025, Mr. Fosheim, "Thank you, thank you, thank you . . . I know how incredibly competent you are and how much I trust and value your abilities."

- March 21, 2025, Mr. Fosheim, "This looks great, Ashley. Thank you."

- Ashley has a professional presence in meetings that is important for clients facing a cybersecurity incident. She is also very skilled with incident response communications.

- Ashley has provided valuable assistance on healthcare transactions. She has helped to spot issues on transactions and anticipate possible issues before they arise. Ashley exhibits strong written communication skills and can be trusted to prepare client-ready emails.

- Ashley did a stellar job at jumping in on a difficult pro bono case, quickly understanding the law and underlying issues, and communicating with the client. Her research and written product, as well as her communication with the client and opposing counsel, were professional and well thought-out. Her efforts ultimately led to a favorable conclusion for a very happy client.

- Ashley is well-organized and is confident in her skills. And her intelligence and legal skills cross many subsectors. Whenever I need a senior associate with scientific experience and creative problem solving abilities, I turn to Ashley.

- Ashley did a lot of legal research on our transaction and was extremely thorough in the research tasks given to her and in handling our closing. Ashley demonstrated teamwork and leadership by working long hours and managed working with attorneys and paralegals in other offices. I am appreciative of the work Ashley did on our deal.

- Ashley demonstrates strong organizational skills and at times has helped the broader healthcare transactions team stay on track with assignments and items on transactions. She has a good handle on the steps necessary to consummate transactions and the ancillary documents that need to be drafted and negotiated.

- I have often recommended Ashley to colleagues in different offices or different practice groups, and I do not hesitate to get her involved with client-facing work.

25.    Ultimately, after a particularly harmful act of discrimination in the summer of 2024, Ms. Ogedegbe complained about discrimination to a colleague, and eventually to HR.

26.    Predictably, the "investigation" into Ms. Ogedegbe's complaints was a sham. One of the witnesses would later admit that he and others were too scared to be honest with HR when being interviewed, and that multiple Firm lawyers threatened the witnesses, saying that if they were honest and supportive of Ms. Ogedegbe, they would lose hours and, ultimately, their jobs.

27.    Almost immediately after making her complaint, Ms. Ogedegbe began to experience unlawful retaliation, including being removed from various projects and given fabricated poor performance feedback.  In addition, in the Fall of 2024, one of the attorneys with whom Ms. Ogedegbe worked the most attempted to have Ms. Ogedegbe transferred into his

group, in large part because she was so successful at helping him prepare pitches that generated millions of dollars in revenues. The transfer was retaliatorily blocked.

28.     Ultimately, in March 2025, Ms. Ogedegbe was unceremoniously terminated in retaliation for engaging in protected activity. The Partners that Ms. Ogedegbe worked for most frequently were not even notified about the decision to terminate her.

29.     Ms. Ogedegbe now brings this action to redress the unlawful employment practices committed against her, including Defendant's discriminatory and retaliatory treatment of her due to her race and/or color in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. § 1981.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant McDermott Will & Emery is headquartered in Chicago, Illinois, and a substantial part of the events or omissions giving rise to this action occurred in this district.

32.     Ms. Ogedegbe will file a Charge of Discrimination with the Equal Employment Opportunity Commission alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"). The Charge, which all also allege violations of the Florida Civil Rights Act ("FCRA") and the Illinois Human Rights Act ("IHRA"), will be cross-filed with the Florida Commission on Human Relations and the Illinois Department of Human Rights. Upon receipt of her Right to Sue, Ms. Ogedegbe will seek to amend the Complaint to add claims under Title VII, the FCRA and the IHRA.

## PARTIES

33.     Plaintiff Ashley Ogedegbe is a citizen of Florida and is a former employee of MWE.  At all relevant times, Plaintiff worked for MWE and met the definition of an "employee" as that term is defined by the applicable statutes.

34.      Defendant McDermott Will & Emery is Headquartered in Chicago, Illinois.  At all relevant times, MWE met the definition of an "employer" as that term is defined by all applicable statutes.

35.     Defendants John Doe 1-10 participated in the decision to terminate Ms. Ogedegbe's employment.  Upon learning the identity of said individuals, Ms. Ogedegbe will seek leave to join name them as Defendants in this action.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

36.     Ms. Ogedegbe already had an impressive background when she joined MWE in October 2022.

37.     After receiving her Bachelor's Degree from Washington University in St. Louis, Ms. Ogedegbe enrolled in law school at Washington University's School of Law, a top 14 law school.

38.     In the Summer of 2018, Ms. Ogedegbe was hired as a Summer Associate at Katten, Muchin & Rosenman, LLP ("Katten") – she was also selected to be a Diversity Scholar at Katten and received a scholarship – and parlayed that experience into an Associate position working on Healthcare Regulatory and Transaction matters.

39.     While at Katten, Ms. Ogedegbe was heavily recruited by MWE.  She was interviewed by six partners.

40.     Ms. Ogedegbe was hesitant to leave Katten because she was often referred to as a "shoe-in" to make Partner there and had strong support from her leadership.

41.     In order to entice her to jump ship, MWE's Digital Health Partners told Ms. Ogedegbe that the team was overwhelmed with Digital Health work and urgently needed an additional attorney with her expertise.

42.     Lisa Mazur (then the Head of the Digital Health practice) also expressed interest in Ms. Ogedegbe's patient safety and peer review practices.

43.     MWE partners described a culture of mentorship, investment in associates and encouragement of professional development.

44.     They emphasized that associates were supported in pursuing their passions, that the team was warm, welcoming and collaborative, and that they valued training and cross-office work.

45.     Unfortunately, however, this congenial work environment was not available to Black lawyers, and particularly Black women.

46.     Indeed, as described herein, from the start of her employment with MWE through her unlawful termination, Ms. Ogedegbe was subjected to systemic discrimination in virtually all facets of her employment, including a hostile work environment, disparate work allocation and intentional exclusion, among other discriminatory treatment.

47.     When Ms. Ogedegbe complained about the discrimination to which she was subjected, she was promptly sidelined and terminated in retaliation for those complaints.

48.     The unlawful treatment directed at Ms. Ogedegbe was not an anomaly.

49.     Rather, it was part and parcel to the Firm's documented history of discriminatory hiring, promotion and work allocation practices that negatively impact black attorneys, and especially black women.

50.     To that end, of the Firm's approximately 700 Partners, only 22 (3%) are Black, and only 9 (1.2%) are Black women.

51.     Moreover, there is not one Black member of the Firm's leadership team (inclusive of the Chairman, Chief Operating Officer, General Counsel, Deputy General Counsels, Chief Financial Officer, Chief Business Development and Marketing Officer, Chief Knowledge Officer, Chief Human Resources ("HR") Officer, Chief of Administration and Chief Strategic Counsel).

52.     10 out of the 11 (91%) persons making up the leadership team are white.  The only Black member of the leadership team, Tony Upshaw, is the Head of Diversity, a concept for which the Firm has very little regard.

53.     The numbers at the Associate level are not much better, but they are somewhat better, indicating that Black attorneys are underrepresented at the Partner level even as compared to the already dismal representation at the Associate level.

## II.     MS. OGEDEGBE JOINS MWE AND EXPERIENCES RACISM IMMEDIATELY

54.     Promptly following her arrival, Ms. Ogedegbe began to experience discrimination and the fact that MWE viewed her as a mere token Black attorney rather than someone who would contribute to the team.

55.     Indeed, although the Firm advertised the Digital Health Associate role as being open to all MWE offices (including remote), Ms. Ogedegbe's initial request to start in Florida was denied by Karen Gibbs, then the Partner-in-Charge of the Health group in the Chicago

office, under the false pretext that most of the Digital Health team that hired her was based in Chicago.

56.     In reality, the Firm wanted Ms. Ogedegbe in Chicago because it had no Black female attorneys in Chicago, which was hurting its recruitment and client development efforts.

57.     Specifically, certain clients required a minimum percentage of diverse attorneys (including Black women) on their legal teams, and the Firm needed to maintain a specific number of diverse attorneys to retain its Mansfield certification.

58.     To that end, Ms. Ogedegbe was included in client pitches to help the Firm appear diverse but then given no work when the Firm was retained.

59.     On Ms. Ogedegbe's very first day at the Firm, a Black receptionist gave her an office tour when HR did not show up to welcome her.  The receptionist told Ms. Ogedegbe that "Black women don't last at the Firm."

60.     Things got worse, quickly.

61.     In November 2022, during Ms. Ogedegbe's first week with MWE, she attended an Associate retreat hosted by the Firm.  One of the events offered during the retreat was a diversity and inclusion program led by a Black woman presenter.

62.     During the program, the presenter asked the Associates in attendance to provide answers to questions such as, "what do you hide about yourself at work" and "what are you most proud of."

63.     The answers were electronically displayed on a large screen set up behind the presenter, for all of those in attendance, including Ms. Ogedegbe, to see.

64.     To her shock and horror, multiple egregiously racist and antisemitic comments were put up on the screen, with some Associates answering these questions with references to "white pride," "white skin," "white power" and "Nazism."

65.     The fact that these comments were made is abhorrent in itself, but even more so because they were made at a diversity and inclusion program – a blatant attempt to harass and intimidate a disproportionately minority audience.

66.     Incredibly, the Firm did virtually nothing to address this brazen demonstration of racism.  Although it would later claim that Firm Chairman Ira Coleman condemned the behavior the next day: (i) it is not clear that this actually occurred; and (ii) if it did occur, it occurred at a nonmandatory meeting that was poorly attended.

67.     There was never any training directed at the behavior, no remedial action was taken and, despite claiming that it would "engage all employees in professionally moderated small group discussions aiming to help bridge differences through the sharing of personal experiences," this simply never occurred.

68.     During a subsequent meeting of the Firm's Diversity Committee, one of Ms. Ogedegbe's former colleagues, Marika Miller, pushed for Firm leadership to issue a formal, written apology, and to conduct an investigation to determine who posted the messages during the retreat.  The Committee responded by explaining that Firm leadership had already confirmed that they would not issue any written statements because they did not want any such statement to be leaked to Above The Law.  The Committee then directed the participants on the call not to discuss the matter further.

69.     Ms. Miller, who was pushing for a formal apology and investigation, was terminated shortly after this Committee call.

70.     Ms. Miller also explained to Ms. Ogedegbe that the reason she was pushing so hard for the apology was because she had observed her friend and former colleague, "Jane Doe"– a Black lawyer who predated Ms. Ogedegbe and who was also the only Black female attorney in the Chicago office during her employment – being subjected to discrimination such as Partners not responding to her emails, disparate work allocations, exclusion and an inability to find a mentor.

71.     Upon her return from the Associate retreat, one of Ms. Ogedegbe's first assignments from Ms. Mazur was to create a compliance plan for credentialing, peer review and patient safety.

72.     In making this request, Ms. Mazur explained that it would be a great opportunity for Ms. Ogedegbe to establish herself as a Firm "expert" on these matters because the prior "expert" on these matters was a Partner who had left the Firm.

73.     After delivering strong work and receiving glowing reviews from the client, the supervising partner, Amanda Enyeart, said the client was so impressed with Ms. Ogedegbe's work that they requested additional work in the form of a comprehensive 50-state survey.

74.     Ms. Enyeart acknowledged that it would be most appropriate for Ms. Ogedegbe to lead the group of Associates assigned to this project given that it was her underlying work that generated the business.  However, once the project commenced, Ms. Enyeart reassigned the leadership role to a white Associate.  It soon became clear that Ms. Enyeart had planned all along to appropriate Ms. Ogedegbe's work and brand herself as the "expert."

75.     To make matters worse, it also became clear that there was no additional meaningful work for Ms. Ogedegbe on the Digital Health team.  The Partners that hired her shunned Ms. Ogedegbe's requests for work and she was excluded from key meetings, projects,

trainings and mentorship opportunities. They even excluded Ms. Ogedegbe's name from an article that she co-authored on December 23, 2022.

76.     The only Partners who gave Ms. Ogedegbe work on a somewhat consistent basis were Black men, and one of the very few white lawyers known to support the development of minority lawyers at the Firm, Gregory Fosheim.

## III.    DISCRIMINATION PERSISTS DURING MS. OGEDEGBE'S FIRST YEAR AT MWE

77.     In January 2023, Ms. Ogedegbe was again reminded that the discrimination to which she was subjected was part and parcel to a broader culture of discrimination against Black lawyers.

78.     Specifically, Ms. Ogedegbe connected with Jane Doe, a former Black female lawyer at the Firm, on LinkedIn. Ms. Doe, who worked in the Chicago office from October 2019 to March 2021, and was the only Black female attorney in Chicago at the time, warned Ms. Ogedegbe about the toxic experience she had while working in the Firm's Health and Digital Health Groups. Like Ms. Ogedegbe, Ms. Doe confirmed that she too was lied to about her opportunities at MWE and that her work was similarly misappropriated, after which the Firm's white Partners refused to give her work and ignored her efforts to obtain it.

79.     On January 30, 2023, a few days after connecting with Ms. Doe, Ms. Ogedegbe reached out to Edith Gondwe, the Firm's Diversity and Inclusion Director. Ms. Ogedegbe expressed her concerns about the discriminatory treatment to which she had been subjected, and Ms. Gondwe expressed her frustration that the Chicago office was continuing to exhibit exclusionary behavior towards Black lawyers.

80.     On February 3, 2023, Ms. Gondwe forwarded Ms. Ogedegbe and her concerns to members of the Diversity Committee and HR.

81.     After being pressured by the Diversity Committee and HR, Partners in the Digital Health practice finally took the most basic steps necessary to integrate Ms. Ogedegbe into the team.

82.     For instance, on February 2, 2023, four months after Ms. Ogedegbe joined the MWE, the Firm finally sent out an email "welcoming" her to the Firm.  This delay was completely inappropriate, as the Firm always prioritizes such welcome emails for non-Black Associates, including for various non-Black Associates who started after Ms. Ogedegbe but had their welcome emails sent before hers.  Far from being merely symbolic, these welcome emails are a critical means of introduction to the Firm and to help new Associates obtain work.

83.     Three days later, on February 6, 2023, Ms. Ogedegbe finally had her first 1:1 calls with the leaders of the Digital Health group – again, four months after she joined the Firm. Although these half-hearted measures helped in the short term, they ultimately failed to remedy the effects of the past and ongoing discrimination.

84.     In early 2023, the Firm created new internal policies (formalized in 2024) that resulted in the exclusion of diverse Associates at business conferences, both because they had a disparate impact on Black attorneys and also because they were applied discriminatorily.  The policy ostensibly required Associates who were looking to attend a conference to write up a business plan in which they demonstrated that they had significant relationships with several attending clients or would bring in new clients to attend the conference.

85.     Ms. Gondwe and many members of the Diversity Committee complained that this policy was discriminatory because, as a result of institutional discrimination, Black Associates at MWE were less likely to have these relationships and their exclusion from the conferences deprived them of opportunities to develop them.

86.     On top of that, when Ms. Ogedegbe reached out to the Director of Business Development, Julia Berman, for assistance, she was initially brushed aside.

87.     Ultimately, Ms. Ogedegbe engaged in extensive networking, cultivated strong client leads and invited the prospective clients to the Firm's Digital Health Forum.  As a result, the Partners in the Digital Health group were forced to approve her attendance.

88.     However, when she arrived, she learned that many non-Black Associates were approved to attend without putting together the requisite business plan.  Instead, they were just invited by non-Black Partners to attend the conference and client meetings to help those non-Black Associates develop client relationships that they did not already have.  In contrast, despite the fact that she earned her way into attendance, the Digital Health Partners in attendance excluded her from their client meetings.

89.     In mid-2023, the Firm hired Theresa Thompson. Part of Ms. Thompson's role was to address discriminatory work allocation at the Firm. In order to help in this regard, Ms. Thompson asked Associates to identify areas of interest to ensure that they received appropriate access/invitations to relevant listservs, events meetings, etc., as well as the opportunity to make connections with relevant attorneys at the Firm.

90.     Ms. Ogedegbe completed the survey and indicated an interest in transactional and regulatory/digital health matters.  Shortly thereafter, in June 2023, a Chicago Partner, Monica Wallace, led a healthcare "bootcamp" training. The Firm itself described this training as "a key initiative that impacts a significant component of our practice . . . [and] an investment in each of you and an investment in the Firm."  Ms. Ogedegbe was inexplicably excluded from the training, whereas a more junior white Associate, Angela Theodoropoulos, was invited. When Ms.

Ogedegbe complained about this discriminatory exclusion, no one was able to provide a coherent explanation.

91.     Around this same time, Ms. Thompson recommended that Ms. Ogedegbe reach out to Jennifer Geetter, a Digital Health Partner based in Washington, D.C.  According to Ms. Thompson, Ms. Geetter expressed a need for staffing on certain client projects.

92.     Unfortunately, Ms. Geetter began to treat Ms. Ogedegbe with discriminatory hostility, including microaggressions such as finding fault in Ms. Ogedegbe's work and doubting the accuracy of her conclusions, only to concede after being corrected by a non-Black attorney, that it was she (Ms. Geetter) who was wrong.

93.     Moreover, despite supposedly finding fault in Ms. Ogedegbe's work, Ms. Geetter appropriated it as her own and used it verbatim.

94.     In addition, Ms. Geetter set unreasonable and impossible to meet deadlines for Ms. Ogedegbe.

95.     Ms. Geetter did not treat white Associates the same way, and Ms. Ogedegbe would later learn that Ms. Geetter had a history of discriminating against Black Associates.

96.     In August 2023, Ms. Ogedegbe was finally permitted to move to the Miami office.  However, she was told before she even got there that the team in Miami would give her very little work.

97.     The Partners that she was physically leaving behind in Chicago retaliated against her by assigning her non-billable work, including to write, present, and publish an article. Incredibly, when the article was published, the Firm failed to include Ms. Ogedegbe's name and instead mistakenly included the name of a totally different Nigerian Associate who worked out

of the D.C. office. There is no more egregious example of the "all Black people are the same" attitude at the Firm than this.

98. When Ms. Ogedegbe finally moved, the Firm provided no relocation assistance and Senior HR Manager Kelly Lawson misspelled her name on the transfer form and provided the wrong office number – in fact, the identified office was empty – in the internal announcement. Moreover, Ms. Ogedegbe's arrival was announced on the wrong day.

99. Given that Ms. Ogedegbe was not permitted to receive work from the Partners in Miami, she was supposed to continue receiving work from the Partners in Chicago. Instead, her work drastically decreased, and her hours dropped significantly.

100. In an effort to stay connected, Ms. Ogedegbe made the modest request to meet with Ms. Mazur for a mere 15 minutes per month. This request was rejected.

101. To put a nail in the coffin for her opportunity to get meaningful work from the Miami Partners, Ms. Mazur told the Miami Partners, including Dana Dombey, not to work with Ms. Ogedegbe. She further slandered Ms. Ogedegbe to the Miami Partners by telling them (falsely and without any examples) that her work product was inaccurate and that she had to write off large portions of Ms. Ogedegbe's time.

102. The sabotage was successful. During Ms. Ogedegbe's 2023 evaluation, held by Bernie Grondin (former Miami Health Partner In Charge) and Ms. Dombey (who was recently promoted to the Miami Health Partner In Charge), Mr. Grondin asked Ms. Ogedegbe about her goals at the Firm, and then immediately indicated that she would be unable to accomplish the goals she articulated, which were only to specialize in transactions and regulatory Health matters (similar to Ms. Dombey, who is white).

103.     Shortly thereafter, Mr. Grondin asked Ms. Ogedegbe to work on an assignment, but once he obtained what he needed from her (a strategic roadmap to structure telehealth companies in all 50 states and a template for a professional services agreement), he dropped her from the project and worked on it with Ms. Dombey.

## IV.    MS. OGEDEGBE'S PERFORMANCE WAS OUTSTANDING DESPITE HAVING TO NAVIGATE A DISCRIMINATORY AND RETALIATORY ENVIRONMENT

104.     Despite having to work in a discriminatory environment riddled with the challenges described above, Ms. Ogedegbe's performance ratings for 2023 were very good, and the overall rating was "Strong," which means that she was an "Associate[ ] who consistently me[ ]t or exceed[ed] the high expectations of McDermott Associates."

105.     She also received a discretionary special bonus.

106.     Comments on her review included, inter alia,

- There have been several instances where Ashley produced high quality work product.

- She is also highly responsive and delivered the work on a tight timeline.

- Ashley is doing a strong job as the associate managing transactions for a PPM client. She moves the process along seamlessly, is super responsive, and her work is always timely and client-ready.

- Ashley's questions are thoughtful and she's great at managing teams– subject matter specialists and a paralegal have all reached out to comment on how great it is to work with Ashley.

- Ashley did an excellent job stepping in on short notice in the middle of a very large and complex transaction where she served as the lead associate on the transaction. She did great at researching regulatory schemes and managed a team of specialists and associates on due diligence and ancillary transaction documentation. She stayed organized, was timely, and worked closely with the client over several months to close the transaction

- Ashley has demonstrated excellent project management skills with limited supervision.

- Ashley has an excellent handle on corporate practice of medicine matters.

- Ashley has demonstrated excellent skills in drafting physician practice management agreements.

- On a complex transaction, Ashley provided excellent leadership of the diligence team that was comprised of Partners and Associates.

- Ashley has been a significant contributor to the digital health practice.

- Quietly steady. Well-organized. Trustworthy. Excellent writer and communicator. I really appreciated how she took on a huge role for a major transaction in her first days with the firm and was unafraid to set deadlines and communicate expectations in a clear and supportive way.

107. Ms. Ogedegbe began working with Stephen Reynolds, a Black Chicago-based Capital Partner who specialized in privacy/cybersecurity. Mr. Reynolds started giving Ms. Ogedegbe work around January 2024. He was immediately impressed with Ms. Ogedegbe's writing and research skills and quickly increased her workload.

108. Ms. Ogedegbe confided in Mr. Reynolds with respect to her prior challenges with the Firm. He encouraged her to stay at MWE and specifically mentioned that he had several large health and life sciences clients with which he could leverage Ms. Ogedegbe's skillset.

109. Meanwhile, however, the Partners in Miami failed to give Ms. Ogedegbe opportunities for meaningful work, and when she did receive work, it was accompanied by discrimination.

110. By way of example, when Ms. Ogedegbe was assigned to work with Partner Matt Friendly, Mr. Friendly constantly underestimated her skills and experience and often confused Ms. Ogedegbe with the Nigerian Associate who worked out of the D.C. office. Mr. Friendly also

scapegoated Ms. Ogedegbe for the mistakes of another MWE Partner, Stephanie DeGennaro, even admitting that he "couldn't blame the Income Partner and ultimately needed [Ms. Ogedegbe] to be the fall person."

111.     In mid-2024, Ms. Ogedegbe was asked to work on hospital bankruptcy transactions with Jay Greathouse (Partner), Paul Lawrence (Partner) and Rosalyn Broad (white Associate, same year as Ms. Ogedegbe).

112.     Ms. Broad had confided in Ms. Ogedegbe that she did not have transactions experience, but she was nonetheless promoted to the lead Associate role for the transactions despite the fact that Ms. Ogedegbe had significant experience with transactions.

113.     Ms. Ogedegbe's first assignment was to lead a Louisiana-based transaction. When the assignment was given to her, Mr. Greathouse conveyed that it would be impossible to accomplish – indeed, it was an assignment with a two-day turnaround that would typically take two months to complete – and that she should just "do [her] best." He also noted that most of the Associates who would otherwise be available to help were tied up with other matters. Of the Associates that were able to help, all were immediately approved other than Karis Jackson, a Black Associate in Washington, D.C. who was only approved after additional steps.

114.     Ultimately, under Ms. Ogedegbe's leadership, the team completed the assignment, to the shock of Mr. Greathouse.

115.     Ms. Ogedegbe would later learn that every other jurisdiction was staffed with a team that included at least two midlevel and/or senior Associates, whereas she was the only one in Louisiana, which evidences further discriminatory resource allocation.

116.     Indeed, as it turned out, Messrs. Greathouse and Lawrence never expected that a buyer would materialize in connection with the Louisiana hospital, which is why they

understaffed it. As luck would have it, a buyer did materialize, at which point Messrs. Greathouse and Lawrence shifted all of their resources into Louisiana and pushed Ms. Ogedegbe out of her leadership role and into a "behind the scenes" role that consisted of, *inter alia*, preparing her white colleagues to sound competent on calls on which Ms. Ogedegbe was not permitted to participate.

117. Ms. Ogedegbe was also cut out of communications between Ms. Broad and the members of her own team, during which Ms. Broad and another white Associate, Kelsey Reinhardt, insulted and undermined Ms. Ogedegbe.

118. Ultimately, because of the ignorance of Mr. Greathouse, Mr. Lawrence and Ms. Broad, the work that Ms. Ogedegbe had done was unnecessarily redone in a way that was not only objectively worse but also violated FTC antitrust rules by unredacting certain sensitive information.

119. Ultimately, Mr. Greathouse told Ms. Ogedegbe that her leadership role on the project was "not working out" and that he needed Ms. Broad and Ms. Reinhardt, two white women, to lead the transaction.

120. Not surprisingly, Mr. Greathouse was unable to articulate a single reason for this decision.

121. Mr. Greathouse admitted that Ms. Ogedegbe had done a great job on the transaction – in fact, he was so impressed by her work that he initially planned to have her lead eight Florida-based transactions – and the most coherent explanation that he provided for her removal was, "sometimes there isn't a reason."

122. Two days later, apparently realizing that Ms. Broad and Ms. Reinhardt were entirely unqualified to lead the transaction, Mr. Greathouse insisted that Ms. Ogedegbe review

and correct their work, and answer their questions to help get them up to speed from "behind the scenes."

123.    Ms. Ogedegbe subsequently complained in writing, and Mr. Greathouse fabricated new reasons for his discriminatory decisions; namely, that Ms. Ogedegbe's performance on the transaction was lacking.  This pretextual justification is entirely undermined by his repeated acknowledgments of her superior performance.

124.    The reality is that when an opportunity for substantial work arose – an opportunity created by Ms. Ogedegbe – the Firm discriminatorily removed her from her leadership role in favor of a white Associate. In addition, after Ms. Ogedegbe documented Mr. Greathouse's misconduct, he removed her from internal listservs, weekly calls and an internal ShareFile related to the transaction.

125.    The discrimination was so obvious that even an outside banker, Nick Davis with Cain Brothers, called out the MWE team for passing off Ms. Ogedegbe's work as their own.

## V.    MS. OGEDEGBE ENGAGES IN PROTECTED ACTIVITY AND SUFFERS RETALIATION

126.    As noted above, when Ms. Ogedegbe was largely removed from her role on the Louisiana deal, her white colleagues were given significantly more support than had been given to her.  One of the additional lawyers put on the project was Ms. Theodoropoulos.

127.    On June 28, 2024, Ms. Theodoropoulos told Ms. Ogedegbe that she noticed she had been removed from various communications concerning the Louisiana transaction, and asked Ms. Ogedegbe what was going on.  Ms. Ogedegbe confided in Ms. Theodoropoulos.  She told Ms. Theodoropoulos that she felt like a hidden figure, and that she believed that there was a concerted effort by Messrs. Greathouse and Lawrence to replace Ms. Ogedegbe with their all-

white team with respect to the public-facing leadership role the moment they learned that the Louisiana deal had a buyer and thus presented a lucrative opportunity.

128.    Ms. Ogedegbe went on to tell Ms. Theodoropoulos about her experience as a Black woman at the Firm, including that it had already been hard enough for her to get work. She explained that she had close Black female friends leave the Firm for the same reasons and that she now felt like she was getting pushed out as well.

129.    Ms. Theodoropoulos noted that she recalled how challenging it was for Ms. Ogedegbe in Chicago and encouraged Ms. Ogedegbe to raise these issues to HR.

130.    For her part, Ms. Ogedegbe did not trust HR because it had known about the issues for years – including Ms. Lawson, to whom Ms. Ogedegbe had complained about discrimination– and no lasting remedial action had ever been taken.

131.    Then, on July 10, 2024, Ms. Lawson reached out to Ms. Ogedegbe unsolicited. Ms. Lawson explained that she had heard some concerning comments that the Firm took seriously, and that she wanted to speak with Ms. Ogedegbe.

132.    On the same day, Ms. Theodoropoulos texted Ms. Ogedegbe and said that she believed that a junior Associate had complained about Ms. Ogedegbe being removed from the Louisiana transaction.  Ms. Ogedegbe would later learn that Ms. Theodoropoulos was lying, and that she knew very well that it was Mr. Greathouse – the individual whom Ms. Ogedegbe accused of misconduct – that went to HR.

133.    In any event, on July 11, 2024, after Ms. Lawson was intentionally deceptive about the purpose of the meeting, Ms. Ogedegbe met with her and a third person who was not on the meeting invite. Apparently, the call was recorded.

134.     During the call, Ms. Lawson's tone was accusatory.  She immediately lied and said that Ms. Theodoropoulos reported her conversation to HR and then began asking questions about cherrypicked quotations from Ms. Ogedegbe's conversation with Ms. Theodoropoulos. She refused to provide any context as to the purpose of the questioning and simply said that she was following Firm procedure as dictated by MWE's General Counsel.

135.     Ms. Lawson went on to ask whether Ms. Ogedegbe believed that she was removed from the Louisiana deal for discriminatory purposes, and whether she felt it was harder to get work at the Firm as a Black woman.  Ms. Ogedegbe replied, yes, and noted that the discrimination had been documented for over two years.

136.     After a sham "investigation," HR predictably concluded that there was no discrimination.  Junior Associate Kyle Hafkey – who was interviewed before Ms. Ogedegbe ever spoke with HR – later admitted that he and others were too scared to be honest with HR when being interviewed, and that Ms. Theodoropoulos and others threatened the Junior Associates, saying that if they were honest and supportive of Ms. Ogedegbe they would lose hours and, ultimately, their jobs.

137.     For her part, Ms. Theodoropoulos was put into higher visibility roles as a "reward" for tipping off Mr. Greathouse about Ms. Ogedegbe's concerns about discrimination. For their part, Messrs. Greathouse and Lawrence were rewarded for bringing in massive revenues on the back of Ms. Ogedegbe's work, for which she received nothing.

138.     It bears noting that during all of this, on August 29, 2024, the team received a preservation notice in connection with their work with the Louisiana transaction.  Later that very same day, Mr. Greathouse claimed to have never received the notice (which he said was "awesome") and Ms. Broad confided that she never saved emails to the system (and that she

would not do so because it would take too long).  During the call, one member of the team Reuben Bank, said that the preservation notice was "scary" because it directed the team not to alter documents.  He followed this up by saying, "I'm gonna alter some documents."  Mr. Greathouse responded, "you can alter the documents." Then, Ms. Theodoropoulos said that her emails responsive to the preservation notice were "in the trash," which resulted in laughter from the team.

139.     Following HR's investigation, Ms. Ogedegbe was subjected to repeated and escalating retaliation.

140.     By way of only one example, Mr. Greathouse was forced, for a short period of time, to include Ms. Ogedegbe in certain meetings from which she had been removed.  He nonetheless effectively excluded her by meeting with the rest of the team in advance of said meetings to discuss substantive matters.  Once Ms. Ogedegbe was invited into the meetings, the Louisiana transaction was not even discussed.  Mr. Greathouse eventually just cancelled the existing meetings and created new ones, from which Ms. Ogedegbe was excluded.

141.     Ironically, even after all of the above, one of the very few assignments that Ms. Ogedegbe was given was to fix errors in the work of Mr. Greathouse's team.  Mr. Greathouse would not even give this assignment to Ms. Ogedegbe directly, instead having Partner Andrea Zazulia convey the task.

142.     In short, Ms. Ogedegbe was asked to identify who, among over 300 physicians, Mr. Greathouse's team failed to identify in connection with its due diligence.

143.     Ms. Ogedegbe informed Ms. Zazulia that she had not worked on the transaction in months, did not work on the physician list and no longer had access to the deal data room or team files.

144.     In response, Ms. Zazulia absurdly suggested that Ms. Ogedegbe attempt to piece the information together using Google searches.

145.     As it turned out, Mr. Greathouse's all white team not only dropped the ball on this but actually failed to identify an entire hospital facility and its contracts (e.g., employment agreements, vendor agreements, etc.), in deal disclosure statements.

146.     Ultimately, Ms. Zazulia determined that it made no sense for Ms. Ogedegbe to perform the task initially assigned, yet Ms. Ogedegbe was subsequently criticized for not being a "team player."

147.     Ms. Ogedegbe made a follow-up complaint to HR about this ongoing discrimination and retaliation, but no remedial action was taken.

148.     Meanwhile, on October 16, 2024, during a Diversity Committee meeting, various Partners expressed concerns regarding the Firm's historical failure to support, promote and retain diverse attorneys.  They noted that the diverse attorneys that were hired between 2020-2024 were disproportionately terminated at a near 1:1 ratio (i.e., one in and one out).  In other words, diverse attorneys were leaving the Firm as quickly as they were being hired.

## VI.     MS. OGEDEGBE'S PERFORMANCE CONTINUES TO BE OUTSTANDING, BUT SHE IS ULTIMATELY TERMINATED IN RETALIATION FOR HER COMPLAINTS

149.     It is a testament to her perseverance that Ms. Ogedegbe continued to perform at a high level throughout 2024 and into 2025 and received another discretionary special bonus for 2024.

150.     Examples of praise heaped upon her by Partners and in her 2024 performance review includes, among many, many other accolades, the following:

- August 3, 2024, Partner Greg Fosheim, "Thanks, Ashley. I am happy to submit a glowing evaluation for you. You've been a valued colleague this year – and [for] several years now."

- October 9, 2024, Partner Jamie Gelfman, describing Ms. Ogedegbe's work product as "perfect."

- January 1, 2025, Partner Danielle Golino, "You[r] comments to [documents] look great!"

- February 16, 2025, Mr. Fosheim, "From my perspective you are doing everything right to make my review as easy as possible."

- February 21, 2025, Mr. Fosheim, "Thank you, thank you, thank you . . . I know how incredibly competent you are and how much I trust and value your abilities."

- March 21, 2025, Mr. Fosheim, "This looks great, Ashley. Thank you."

- Ashley has a professional presence in meetings that is important for clients facing a cybersecurity incident. She is also very skilled with incident response communications.

- Ashley has provided valuable assistance on healthcare transactions. She has helped to spot issues on transactions and anticipate possible issues before they arise. Ashley exhibits strong written communication skills and can be trusted to prepare client-ready emails.

- Ashley did a stellar job at jumping in on a difficult pro bono case, quickly understanding the law and underlying issues, and communicating with the client. Her research and written product, as well as her communication with the client and opposing counsel, were professional and well thought-out. Her efforts ultimately led to a favorable conclusion for a very happy client.

- Ashley is well-organized and is confident in her skills. And her intelligence and legal skills cross many subsectors. Whenever I need a senior associate with scientific experience and creative problem solving abilities, I turn to Ashley.

- Ashley did a lot of legal research on our transaction and was extremely thorough in the research tasks given to her and in handling our closing. Ashley demonstrated teamwork and leadership by working long hours and managed working with attorneys and

paralegals in other offices. I am appreciative of the work Ashley did on our deal.

- Ashley demonstrates strong organizational skills and at times has helped the broader healthcare transactions team stay on track with assignments and items on transactions. She has a good handle on the steps necessary to consummate transactions and the ancillary documents that need to be drafted and negotiated.

- I have often recommended Ashley to colleagues in different offices or different practice groups, and I do not hesitate to get her involved with client-facing work.

151.     In addition to all of the foregoing, in the Fall of 2024, Mr. Reynolds attempted to have Ms. Ogedegbe transferred into his group, in large part because she was so successful at helping him prepare pitches that generated millions of dollars in revenues.  The Healthcare group retaliatorily blocked the transfer.

152.     Unfortunately, the individuals who were the subject of Ms. Ogedegbe's discrimination complaints were able to sabotage her overall performance rating by adding false and retaliatory performance criticisms into the review.  Only a few months later, on March 27, 2025, Ms. Ogedegbe was unceremoniously terminated in retaliation for engaging in protected activity.

153.     Outrageously, the Partners that Ms. Ogedegbe worked for most frequently, Mr. Reynolds and Mr. Fosheim, were not even notified about the decision to terminate Ms. Ogedegbe.

**FIRST CAUSE OF ACTION**
**Discrimination in Violation of 42 U.S.C. § 1981**
**(Against All Defendants)**

154.     Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

155.     As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, subjecting Plaintiff to disparate treatment.

156.     As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, creating a hostile work environment for Plaintiff.

157.      As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

158.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

159.     Defendant's discriminatory treatment constitute malicious, willful and wanton violation of § 1981 for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of 42 U.S.C. § 1981**
**(Against All Defendants)**

160.     Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

161.     Defendants retaliated against Plaintiff for engaging in protected activity, by, *inter alia*, subjecting her to disparate treatment and terminating her employment.

162.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, economic damages for which she is entitled to an award of damages.

163. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

164. Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of § 1981 for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of Florida and the State of Illinois;

B. An injunction and order permanently restraining the Defendant and their officers, officials, agents, successors, employees and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein.

C. An injunction and order requiring the Defendants to take appropriate action to protect employees, prevent discrimination and provide avenues for prompt and immediate corrective action, with such measures to include, but not be limited to, the measures set forth above.

D. An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages.

E. An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory

damages, including, but not limited to, compensation for emotional distress and/or mental anguish.

   F.  An award of punitive damages and any applicable penalties in an amount to be determined at trial.

   G.  Prejudgment interest on all amounts due.

   H.  An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law.

   I.  Reinstatement.

   J.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

   Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 30, 2025
   New York, New York,    Respectfully submitted,


          **WIGDOR LLP**

          _____
           Michael J. Willemin

          85 Fifth Avenue
          New York, NY 10003
          Telephone: (212) 257-6800
          Facsimile: (212) 257-6845
          mwillemin@wigdorlaw.com

          *Counsel for Plaintiff Ashley Ogedegbe*