**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ASHLEY OGEDEGBE,<br><br>Plaintiff,<br><br>v.<br><br>MCDERMOTT WILL & EMERY LLP; and JOHN DOES 1-10,<br><br>Defendants. | Case No. 1:25-cv-8908 (JLA) (LKN)<br><br>Judge Jorge L. Alonso |

**DEFENDANT MCDERMOTT WILL & SCHULTE LLP'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant McDermott Will & Schulte LLP f/k/a McDermott Will & Emery LLP ("Defendant" or "the firm"), by and through its undersigned counsel and pursuant to Federal Rules of Civil Procedure 8 and 12, submits the following Answer and Affirmative Defenses to the First Amended Complaint ("FAC") of Plaintiff Ashley Ogedegbe ("Plaintiff" or "Ogedegbe"):

## PRELIMINARY STATEMENT

1. On Ms. Ogedegbe's very first day at MWE, she was supposed to meet a member of Human Resources ("HR") to give her a tour of the office. The HR representative never showed up, so instead she was given the tour by a Black receptionist who delivered an ominous message: **"Black women don't last at the Firm."** Unfortunately, it did not take long for Ms. Ogedegbe to discover why.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations pertaining to the receptionist. The firm denies the remaining allegations in Paragraph 1 of the FAC.

2. Indeed, during her very first week at MWE, Ms. Ogedegbe – an experienced lawyer who has received various plaudits – including being named to the National Black Lawyers Top 40 under 40 list, as well to the Top 10 under 40 Florida Health Law Section of the Florida Bar – experienced egregious and open racism firsthand.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations concerning her background and recognitions. The firm denies the remaining allegations in Paragraph 2 of the FAC.

3. It was at an Associate retreat in November of 2022. One of the events offered during the retreat was a diversity and inclusion program led by a Black woman presenter.

**ANSWER:** The firm admits that it held an associate retreat in November 2022 at which there was a diversity and inclusion program led by a guest speaker who is a Black woman. The firm denies the remaining allegations in Paragraph 3 of the FAC.

4. During the program, the presenter asked the Associates in attendance to provide answers to questions such as, "what do you hide about yourself at work" and "what are you most proud of."

**ANSWER:** The firm admits the allegations in Paragraph 4 of the FAC.

5. The answers were electronically displayed on a large screen set up behind the presenter, for all of those in attendance, including Ms. Ogedegbe, to see.

**ANSWER:** The firm admits that the guest speaker, using technology not supplied by the firm, had answers electronically displayed on a large screen behind her that was visible to those in attendance. The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations concerning whether she was in attendance. The firm denies the remaining allegations in Paragraph 5 of the FAC.

6. To her shock and horror, multiple egregiously racist and antisemitic comments were put up on the screen, with some Associates answering these questions with references to **"white pride," "white skin," "white power"** and **"Nazism."**

**ANSWER:** The firm admits that comments as stated in Paragraph 6 of the FAC—amid multiple other different comments—appeared on the screen. The firm further states that it in no way condones or endorses the comments identified in Paragraph 6 of the FAC. The firm lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 6 of the FAC.

7. The fact that these comments were made is abhorrent in itself, but even more so because they were made at a diversity and inclusion program – a blatant attempt to threaten and intimidate a disproportionately minority audience. Indeed, the Associates hid behind their ability to post these statements anonymously.

**ANSWER:** The firm admits that the comments identified in Paragraph 6 of the FAC are abhorrent and states that they are not reflective of the firm's values in any way. The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in the last sentence of Paragraph 7 of the FAC. The firm denies the remaining allegations in Paragraph 7 of the FAC.

8. Incredibly, the Firm did virtually nothing to address this brazen demonstration of racism. Although it would later claim that Firm Chairman Ira Coleman condemned the behavior the next day: (i) it is not clear that this actually occurred; and (ii) if it did occur, it occurred at a nonmandatory meeting that was poorly attended.

**ANSWER:** The firm admits that Firm Chairman Ira Coleman stated that the comments were abhorrent and condemned the behavior the following morning with the associates prior to the keynote speaker's remarks. The firm further states that it conducted a thorough investigation into the incident but was unable to determine who—whether an associate or third party—submitted the comments. The firm denies the remaining allegations in Paragraph 8 of the FAC.

9. There was never any training directed at the behavior, no remedial action was taken and, despite claiming that it would "engage all employees in professionally moderated small group discussions aiming to help bridge differences through the sharing of personal experiences," this simply never occurred.

**ANSWER:** The firm denies the allegations in Paragraph 9 of the FAC.

10. When one of Ms. Ogedegbe's former colleagues pushed for Firm leadership to issue a formal written apology and conduct an investigation, she was directed not to discuss the matter further and terminated shortly thereafter.

**ANSWER:** The firm denies the allegations in Paragraph 10 of the FAC.

11. The Firm has consistently weaponized its HR department as a shield against accountability, conducting sham investigations to conceal the truth. Instead of addressing legitimate complaints of discrimination, the Firm has systematically misled its victims, withheld critical information, and manipulated the process to protect the Firm.

**ANSWER:** The firm denies the allegations in Paragraph 11 of the FAC.

12. As Ms. Ogedegbe would learn over the following years, the display of racism at the November 2022 Associate retreat, while perhaps the most explicit, was far from unusual at the Firm. Indeed, from the top down, the Firm has shown a remarkable apathy for hiring, developing, retaining and promoting people of color, even while it tells the outside world that it is committed to racial diversity.[1]

**ANSWER:** The firm denies the allegations in Paragraph 12 of the FAC (including those in the footnote).

13. To that end, of the Firm's approximately 700 Partners, only 22 (3%) are Black, and only 9 (1.2%) are Black women. The numbers at the Associate level are not much better, but they are somewhat better, indicating that Black attorneys are underrepresented at the Partner level even as compared to the already dismal representation at the Associate level. This is illustrative of the fact that Black Associates are discriminated against, are not mentored, are provided fewer opportunities for career development and, as a result, "don't last at the Firm."

**ANSWER:** The firm denies the allegations in Paragraph 13 of the FAC.

14. The Firm does not have a single Black female Capital Partner, after it pushed out its only Black female Capital Partner in 2024.

**ANSWER:** The firm admits that a Black female capital partner left the firm in 2024 and that it currently does not have a Black female capital partner. The firm denies the remaining allegations in Paragraph 14 of the FAC.

15. Moreover, there is not one Black person among the Firm's Chairman, Chief Operating Officer, General Counsel, Deputy General Counsels, Chief Financial Officer, Chief Business Development and Marketing Officer, Chief Knowledge Officer, Chief Human Resources Officer, Chief of Administration or Chief Strategic Counsel.

**ANSWER:** The firm admits that none of the positions identified in Paragraph 15 of the FAC presently are filled by Black persons but denies that this was true at all times during Ogedegbe's employment and further denies any remaining allegations in Paragraph 15 of the FAC.

---

[1] In 2021, MWE issued a press release, which it has since been removed from its website, celebrating itself for being Mansfield certified. This press release was reposted on X/Twitter, LinkedIn and every other public marketing channel in an effort to attract diverse candidates and lead clients to believe that diversity existed at MWE. MWE continued to issue similar press releases and statements about its Mansfield certifications up until as recently as late last year. These press releases and statements have been scrubbed from MWE's websites and social media, likely because the Firm is gutlessly cowering in fear in response to President Trump's attitudes towards Diversity, Equity and Inclusion.

16. 10 out of the 11 (91%) persons making up the leadership team are white. The only Black member of the leadership team, Anthony Upshaw, is the Head of Diversity, a concept for which the Firm has very little regard.

**ANSWER:** The firm admits that Anthony Upshaw, Head of Diversity, is presently the sole member of the leadership team who is Black but denies that this was true at all times during Ogedegbe's employment. The firm denies the remaining allegations in Paragraph 16 of the FAC.

17. The few Black lawyers that the Firm does employ are relegated to token status and regularly disregarded when they are not being used to try to convince clients and the outside world that the Firm is diverse.

**ANSWER:** The firm denies the allegations in Paragraph 17 of the FA.

18. For example, the position that Ms. Ogedegbe took was advertised as being open to all MWE offices (and even remote). However, when Ms. Ogedegbe was hired, her request to work in Florida was denied, despite the job description promoting availability in Miami and her passing the Florida bar a year earlier in 2021. She was told that she had to work from the Chicago office under the false pretext that most of the Digital Health team that hired her was based in Chicago. In reality, the Firm wanted Ms. Ogedegbe in Chicago because it had no Black female attorneys in Chicago, which was hurting its recruitment and client development efforts. To that end, Ms. Ogedegbe was included in client pitches to help the Firm appear diverse but then given no work when the Firm was retained.

**ANSWER:** The firm admits that the posting for the position into which Ogedegbe was hired stated that it was open to any U.S. office. The firm further admits that Ogedegbe presented herself as a candidate to the Chicago office, which strengthened her candidacy given that most of the firm's Digital Health attorneys were located in Chicago. The firm also admits that Ogedegbe was included in client pitches. The firm denies the remaining allegations in Paragraph 18 of the FAC.

19. The Firm did not even send out a welcome email in connection with the start of Ms. Ogedegbe's employment until four months after she started. Various non-Black Associates who were hired after Ms. Ogedegbe had their welcome emails sent out before hers. When she initially started, they gave her an office typically reserved for a secretary. When Ms. Ogedegbe was finally permitted to move to Miami, a Senior HR Manager misspelled her name on the transfer form, provided the wrong office number in the internal announcement – in fact, the identified office was empty –and announced her arrival on the wrong day.

**ANSWER:** The firm admits that the welcome email for Ogedegbe was delayed due to a process-related oversight error. The firm further admits that it sent welcome emails for several non-Black associates who were hired after Ogedegbe shortly before hers. The firm states further that those welcome emails were also delayed and, in one case, the email was never sent out. The firm also admits that clerical errors were made including, e.g., the misspelling of Ogedegbe's name and the misidentification of her office number, which were remedied. The firm denies the remaining allegations in Paragraph 19 of the FAC.

20. Oftentimes the Firm could not even keep its own Black lawyers straight. By way of example, Ms. Ogedegbe was asked to write, present and publish an article. Incredibly, when the article was published, the Firm failed to include Ms. Ogedegbe's name and instead mistakenly included the name of a totally different Nigerian Associate who worked out of the D.C. office. There is no more egregious example of the "all Black people are the same" attitude at the Firm than this.

**ANSWER:** The firm denies the allegations in Paragraph 20 of the FAC.

21. As described in detail herein, the aforementioned examples barely scratch the surface. Throughout her time at the Firm, Ms. Ogedegbe was subjected to blatant and consistent discrimination, including, but not limited to, disparate work allocation and opportunities, exclusion from important trainings, meetings, phone calls, conferences, etc., discriminatory appropriation of Ms. Ogedegbe's work and the list goes on.

**ANSWER:** The firm denies the allegations in Paragraph 21 of the FAC.

22. Most frustratingly, there were multiple occasions when Ms. Ogedegbe's outstanding work led to clients giving the Firm a mandate for more work, which Ms. Ogedegbe was excluded from. To make matters worse, in one case the white lawyers who were given the fruits of Ms. Ogedegbe's labor performed so poorly that Ms. Ogedegbe had to correct their work, but only from behind the scenes. On another occasion, Ms. Ogedegbe was told that she was going to need to be the "fall person" after a white income Partner made various mistakes.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegation concerning what an unnamed individual allegedly told her. The firm denies the remaining allegations in Paragraph 22 of the FAC.

23. The discrimination faced by Black lawyers, and Black female lawyers in particular, was well known at MWE. Throughout her tenure with the Firm, Ms. Ogedegbe also became aware of multiple other Black female lawyers who also were discriminated against, most of whom

ultimately left or were terminated. Several of these Black women confided in Ms. Ogedegbe and others. Even the Firm's Diversity and Inclusion Director expressed her frustration that the Chicago office was continuing to exhibit exclusionary behavior towards Black lawyers.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations concerning what other unnamed Black female lawyers allegedly told her. The firm denies the remaining allegations in Paragraph 23 of the FAC.

24. Despite facing a constant barrage of discrimination and inequality, Ms. Ogedegbe's performance was outstanding, which was acknowledged in her performance reviews and various communications right up until her unlawful termination. Examples include, *inter alia*:

- There have been several instances where Ashley produced high quality work product.
- She is also highly responsive and delivered the work on a tight timeline.
- Ashley is doing a strong job as the associate managing transactions for a PPM client. She moves the process along seamlessly, is super responsive, and her work is always timely and client-ready.
- Ashley's questions are thoughtful and she's great at managing teams– subject matter specialists and a paralegal have all reached out to comment on how great it is to work with Ashley.
- Ashley did an excellent job stepping in on short notice in the middle of a very large and complex transaction where she served as the lead associate on the transaction. She did great at researching regulatory schemes and managed a team of specialists and associates on due diligence and ancillary transaction documentation. She stayed organized, was timely, and worked closely with the client over several months to close the transaction
- Ashley has demonstrated excellent project management skills with limited supervision.
- Ashley has an excellent handle on corporate practice of medicine matters.
- Ashley has demonstrated excellent skills in drafting physician practice management agreements.
- On a complex transaction, Ashley provided excellent leadership of the diligence team that was comprised of Partners and Associates.
- Ashley has been a significant contributor to the digital health practice.

- Quietly steady. Well-organized. Trustworthy. Excellent writer and communicator. I really appreciated how she took on a huge role for a major transaction in her first days with the firm and was unafraid to set deadlines and communicate expectations in a clear and supportive way.

- August 3, 2024, Partner Greg Fosheim, “Thanks, Ashley. I am happy to submit a glowing evaluation for you. You’ve been a valued colleague this year – and [for] several years now.”

- October 9, 2024, Partner Jamie Gelfman, describing Ms. Ogedegbe’s work product as “perfect.”

- January 1, 2025, Partner Danielle Golino, “You[r] comments to [documents] look great!”

- February 16, 2025, Mr. Fosheim, “From my perspective you are doing everything right to make my review as easy as possible.”

- February 21, 2025, Mr. Fosheim, “Thank you, thank you, thank you . . . I know how incredibly competent you are and how much I trust and value your abilities.”

- March 21, 2025, Mr. Fosheim, “This looks great, Ashley. Thank you.”

- Ashley has a professional presence in meetings that is important for clients facing a cybersecurity incident. She is also very skilled with incident response communications.

- Ashley has provided valuable assistance on healthcare transactions. She has helped to spot issues on transactions and anticipate possible issues before they arise. Ashley exhibits strong written communication skills and can be trusted to prepare client-ready emails.

- Ashley did a stellar job at jumping in on a difficult pro bono case, quickly understanding the law and underlying issues, and communicating with the client. Her research and written product, as well as her communication with the client and opposing counsel, were professional and well thought-out. Her efforts ultimately led to a favorable conclusion for a very happy client.

- Ashley is well-organized and is confident in her skills. And her intelligence and legal skills cross many subsectors. Whenever I need a senior associate with scientific experience and creative problem solving abilities, I turn to Ashley.

- Ashley did a lot of legal research on our transaction and was extremely thorough in the research tasks given to her and in handling our closing. Ashley demonstrated teamwork and leadership by working long hours and managed working with attorneys and paralegals in other offices. I am appreciative of the work Ashley did on our deal.

- Ashley demonstrates strong organizational skills and at times has helped the broader healthcare transactions team stay on track with assignments and items on transactions. She has a good handle on the steps necessary to consummate transactions and the ancillary documents that need to be drafted and negotiated.
- I have often recommended Ashley to colleagues in different offices or different practice groups, and I do not hesitate to get her involved with client-facing work.

**ANSWER:** The firm admits that comments were made regarding Ogedegbe in the "Strengths" sections of her 2023 and 2024 performance reviews and to Ogedegbe in other communications as stated in Paragraph 24 of the FAC. The firm denies that the allegations contained in Paragraph 24 represent Ogedegbe's performance reviews or performance-related communications accurately or in their entirety. The firm denies the remaining allegations in Paragraph 24 of the FAC.

25. Ultimately, after a particularly harmful act of discrimination in the summer of 2024, Ms. Ogedegbe complained about discrimination to a colleague, and eventually to HR.

**ANSWER:** The firm admits that in approximately the summer of 2024, Ogedegbe participated in a discussion with HR complained about alleged discrimination. The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegation concerning whether she complained of discrimination to a colleague. The firm denies the remaining allegations in Paragraph 25 of the FAC.

26. Predictably, the "investigation" into Ms. Ogedegbe's complaints was a sham. One of the witnesses would later admit that he and others were too scared to be honest with HR when being interviewed, and that multiple Firm lawyers threatened the witnesses, saying that if they were honest and supportive of Ms. Ogedegbe, they would lose hours and, ultimately, their jobs.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegation concerning what the unnamed individual allegedly stated. The firm denies the remaining allegations in Paragraph 26 of the FAC.

27. Almost immediately after making her complaint, Ms. Ogedegbe began to experience unlawful retaliation, including being removed from various projects and given fabricated poor performance feedback. In addition, in the Fall of 2024, one of the attorneys with

whom Ms. Ogedegbe worked the most attempted to have Ms. Ogedegbe transferred into his group, in large part because she was so successful at helping him prepare pitches that generated millions of dollars in revenues. The transfer was retaliatorily blocked.

**ANSWER:** The firm denies the allegations in Paragraph 27 of the FAC.

28. Ultimately, in March 2025, Ms. Ogedegbe was unceremoniously terminated in retaliation for engaging in protected activity. The Partners that Ms. Ogedegbe worked for most frequently were not even notified about the decision to terminate her.

**ANSWER:** The firm admits that in March 2025, Ogedegbe's employment was terminated due to poor performance. The firm denies the remaining allegations in Paragraph 28 of the FAC.

29. Ms. Ogedegbe now brings this action to redress the unlawful employment practices committed against her, including Defendant's discriminatory and retaliatory treatment of her due to her race and/or color in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

**ANSWER:** The firm admits that Ogedegbe brings this action for alleged discrimination and retaliation due to her race and/or color pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). The firm denies that Ogedegbe was discriminated against as alleged and further denies the remaining allegations in Paragraph 29 of the FAC.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"). The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

**ANSWER:** The firm admits that this Court has jurisdiction over Ogedegbe's Section 1981 and Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343. The firm further admits that this Court has jurisdiction over Ogedegbe's claims arising under state law pursuant to 28 U.S.C. § 1367(a). The firm denies the remaining allegations in Paragraph 30 of the FAC.

31. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant McDermott Will & Emery is headquartered in Chicago, Illinois, and a substantial part of the events or omissions giving rise to this action occurred in this district.

**ANSWER:** The firm admits that it is headquartered in Chicago, Illinois and that venue is proper. The firm denies the remaining allegations in Paragraph 31 of the FAC.

## ADMINISTRATIVE PREREQUISITES

32. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful discrimination and retaliation in violation of Title VII, the Florida Civil Rights Act ("FCRA") and the Illinois Human Rights Act ("IHRA"). She also cross-filed with the Florida Commission on Human Rights and the Illinois Department of Human Rights. She received her Notice of Right to Sue from the EEOC on November 13, 2025.

**ANSWER:** The firm admits that Ogedegbe filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC"), captioned EEOC Charge No. 440-2025-12474, which alleged unlawful discrimination and retaliation. The firm further admits the Charge contained statements referencing cross-filing the Charge with the Florida Commission on Human Rights and the Illinois Department of Human Rights, but denies that the Charge alleged violations of Title VII, the Florida Civil Rights Act ("FCRA"), or the Illinois Human Rights Act ("IHRA") specifically. The firm further admits the EEOC issued a Notice of Right to Sue as to EEOC Charge No. 440-2025-12474, dated November 13, 2025. The firm lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 32 of the FAC.

33. Any and all other prerequisites to the filing of this suit have been met.

**ANSWER:** The firm denies the allegations in Paragraph 33 of the FAC.

## PARTIES

34. Plaintiff Ashley Ogedegbe is a citizen of Florida and is a former employee of MWE. At all relevant times, Plaintiff worked for MWE and met the definition of an "employee" as that term is defined by the applicable statutes.

**ANSWER:** The firm admits that Ogedegbe is a former employe of the firm. The firm lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 34 of the FAC.

35. Defendant McDermott Will & Emery is Headquartered in Chicago, Illinois. At all relevant times, MWE met the definition of an "employer" as that term is defined by all applicable statutes.

**ANSWER:** The firm admits the allegations in Paragraph 35 of the FAC.

36. Defendants John Doe 1-10 participated in the decision to terminate Ms. Ogedegbe's employment. Upon learning the identity of said individuals, Ms. Ogedegbe will seek leave to join name them as Defendants in this action.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 36 of the FAC.

## FACTUAL ALLEGATIONS

### I. BACKGROUND

37. Ms. Ogedegbe already had an impressive background when she joined MWE in October 2022.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 37 of the FAC.

38. After receiving her Bachelor's Degree from Washington University in St. Louis, Ms. Ogedegbe enrolled in law school at Washington University's School of Law, a top 14 law school.

**ANSWER:** The firm admits that Ogedegbe obtained her bachelor's degree from Washington University in St. Louis and thereafter enrolled in law school at Washington University's School of Law. The firm lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 38 of the FAC.

39. In the Summer of 2018, Ms. Ogedegbe was hired as a Summer Associate at Katten, Muchin & Rosenman, LLP ("Katten") – she was also selected to be a Diversity Scholar at Katten and received a scholarship – and parlayed that experience into an Associate position working on Healthcare Regulatory and Transaction matters.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39 of the FAC.

40. While at Katten, Ms. Ogedegbe was heavily recruited by MWE. She was interviewed by six partners.

**ANSWER:** The firm admits that Ogedegbe was interviewed by approximately six partners. The firm denies the remaining allegations in Paragraph 40 of the FAC.

41. Ms. Ogedegbe was hesitant to leave Katten because she was often referred to as a "shoe-in" to make Partner there and had strong support from her leadership.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 of the FAC.

42. In order to entice her to jump ship, MWE's Digital Health Partners told Ms. Ogedegbe that the team was overwhelmed with Digital Health work and urgently needed an additional attorney with her expertise.

**ANSWER:** The firm denies the allegations in Paragraph 42 of the FAC.

43. Lisa Mazur (then the Head of the Digital Health practice) also expressed interest in Ms. Ogedegbe's patient safety and peer review practices.

**ANSWER:** The firm admits that Lisa Mazur, then one of the Heads of the Digital Health team, expressed interested in Ogedegbe's alleged experience with patient safety and peer review practices. The firm denies any remaining allegations in Paragraph 43 of the FAC.

44. MWE partners described a culture of mentorship, investment in associates and encouragement of professional development.

**ANSWER:** The firm admits the allegations in Paragraph 44 of the FAC.

45. They emphasized that associates were supported in pursuing their passions, that the team was warm, welcoming and collaborative, and that they valued training and cross-office work.

**ANSWER:** The firm admits the allegations in Paragraph 45 of the FAC.

46. Unfortunately, however, this congenial work environment was not available to Black lawyers, and particularly Black women.

**ANSWER:** The firm denies the allegations in Paragraph 46 of the FAC.

47. Indeed, as described herein, from the start of her employment with MWE through her unlawful termination, Ms. Ogedegbe was subjected to systemic discrimination in virtually all facets of her employment, including a hostile work environment, disparate work allocation and intentional exclusion, among other discriminatory treatment.

**ANSWER:** The firm denies the allegations in Paragraph 47 of the FAC.

48. When Ms. Ogedegbe complained about the discrimination to which she was subjected, she was promptly sidelined and terminated in retaliation for those complaints.

**ANSWER:** The firm denies the allegations in Paragraph 48 of the FAC.

49. The unlawful treatment directed at Ms. Ogedegbe was not an anomaly.

**ANSWER:** The firm denies that Ogedegbe was subjected to unlawful treatment and further denies the remaining allegations in Paragraph 49 of the FAC.

50. Rather, it was part and parcel to the Firm's documented history of discriminatory hiring, promotion and work allocation practices that negatively impact black attorneys, and especially black women.

**ANSWER:** The firm denies the allegations in Paragraph 50 of the FAC.

51. To that end, of the Firm's approximately 700 Partners, only 22 (3%) are Black, and only 9 (1.2%) are Black women.

**ANSWER:** The firm denies the allegations in Paragraph 51 of the FAC.

52. Moreover, there is not one Black member of the Firm's leadership team (inclusive of the Chairman, Chief Operating Officer, General Counsel, Deputy General Counsels, Chief Financial Officer, Chief Business Development and Marketing Officer, Chief Knowledge Officer, Chief Human Resources ("HR") Officer, Chief of Administration and Chief Strategic Counsel).

**ANSWER:** The firm denies the allegations in Paragraph 52 of the FAC.

53. 10 out of the 11 (91%) persons making up the leadership team are white. The only Black member of the leadership team, Tony Upshaw, is the Head of Diversity, a concept for which the Firm has very little regard.

**ANSWER:** The firm admits that Anthony Upshaw, Head of Diversity, is presently the sole member of the leadership team who is Black but denies that this was true at all times during Ogedegbe's employment. The firm denies the remaining allegations in Paragraph 53 of the FAC.

54. The numbers at the Associate level are not much better, but they are somewhat better, indicating that Black attorneys are underrepresented at the Partner level even as compared to the already dismal representation at the Associate level.

**ANSWER:** The firm denies the allegations in Paragraph 54 of the FAC.

## II. MS. OGEDEGBE JOINS MWE AND EXPERIENCES RACISM IMMEDIATELY

55. Promptly following her arrival, Ms. Ogedegbe began to experience discrimination and the fact that MWE viewed her as a mere token Black attorney rather than someone who would contribute to the team.

**ANSWER:** The firm denies the allegations in Paragraph 55 of the FAC.

56. Indeed, although the Firm advertised the Digital Health Associate role as being open to all MWE offices (including remote), Ms. Ogedegbe's initial request to start in Florida was denied by Karen Gibbs, then the Partner-in-Charge of the Health group in the Chicago office, under the false pretext that most of the Digital Health team that hired her was based in Chicago.

**ANSWER:** The firm admits that the posting for the position stated that it was open to any U.S. office. The firm further admits that most of the firm's Digital Health attorneys were in Chicago. The firm denies the remaining allegations in Paragraph 56 of the FAC.

57. In reality, the Firm wanted Ms. Ogedegbe in Chicago because it had no Black female attorneys in Chicago, which was hurting its recruitment and client development efforts.

**ANSWER:** The firm denies the allegations in Paragraph 57 of the FAC.

58. Specifically, certain clients required a minimum percentage of diverse attorneys (including Black women) on their legal teams, and the Firm needed to maintain a specific number of diverse attorneys to retain its Mansfield certification.

**ANSWER:** The firm denies the allegations in Paragraph 58 of the FAC.

59. To that end, Ms. Ogedegbe was included in client pitches to help the Firm appear diverse but then given no work when the Firm was retained.

**ANSWER:** The firm admits that Ogedegbe was included in client pitches. The firm denies the remaining allegations in Paragraph 59 of the FAC.

60. On Ms. Ogedegbe's very first day at the Firm, a Black receptionist gave her an office tour when HR did not show up to welcome her. The receptionist told Ms. Ogedegbe that "Black women don't last at the Firm."

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegation pertaining to the receptionist. The firm denies the remaining allegations in Paragraph 60 of the FAC.

61. Things got worse, quickly.

**ANSWER:** The firm denies the allegations in Paragraph 61 of the FAC.

62. In November 2022, during Ms. Ogedegbe's first week with MWE, she attended an Associate retreat hosted by the Firm. One of the events offered during the retreat was a diversity and inclusion program led by a Black woman presenter.

**ANSWER:** The firm admits the allegations in Paragraph 62 of the FAC.

63. During the program, the presenter asked the Associates in attendance to provide answers to questions such as, "what do you hide about yourself at work" and "what are you most proud of."

**ANSWER:** The firm admits the allegations in Paragraph 63 of the FAC.

64. The answers were electronically displayed on a large screen set up behind the presenter, for all of those in attendance, including Ms. Ogedegbe, to see.

**ANSWER:** The firm admits that the guest speaker, using technology not supplied by the firm, had answers electronically displayed on a large screen behind her that was visible to those in attendance. The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations concerning whether she was in attendance. The firm denies the remaining allegations in Paragraph 64 of the FAC.

65. To her shock and horror, multiple egregiously racist and antisemitic comments were put up on the screen, with some Associates answering these questions with references to "white pride," "white skin," "white power" and "Nazism."

**ANSWER:** The firm admits that comments as stated in Paragraph 65 of the FAC—amid multiple other different comments—appeared on the screen. The firm further states that it in no way condones or endorses the comments identified in Paragraph 65 of the FAC. The firm lacks

knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 65 of the FAC.

66. The fact that these comments were made is abhorrent in itself, but even more so because they were made at a diversity and inclusion program – a blatant attempt to harass and intimidate a disproportionately minority audience.

**ANSWER:** The firm admits that the comments identified in Paragraph 66 of the FAC are abhorrent and states that they are not reflective of the firm's values in any way. The firm denies the remaining allegations in Paragraph 66 of the FAC.

67. Incredibly, the Firm did virtually nothing to address this brazen demonstration of racism. Although it would later claim that Firm Chairman Ira Coleman condemned the behavior the next day: (i) it is not clear that this actually occurred; and (ii) if it did occur, it occurred at a nonmandatory meeting that was poorly attended.

**ANSWER:** The firm admits that Firm Chairman Ira Coleman stated that the comments were abhorrent and condemned the behavior the following morning with the associates prior to the keynote speaker's remarks. The firm further states that it conducted a thorough investigation into the incident but was unable to determine who—whether an associate or third party—submitted the comments. The firm denies the remaining allegations in Paragraph 67 of the FAC.

68. There was never any training directed at the behavior, no remedial action was taken and, despite claiming that it would "engage all employees in professionally moderated small group discussions aiming to help bridge differences through the sharing of personal experiences," this simply never occurred.

**ANSWER:** The firm denies the allegations in Paragraph 68 of the FAC.

69. During a subsequent meeting of the Firm's Diversity Committee, one of Ms. Ogedegbe's former colleagues, Marika Miller, pushed for Firm leadership to issue a formal, written apology, and to conduct an investigation to determine who posted the messages during the retreat. The Committee responded by explaining that Firm leadership had already confirmed that they would not issue any written statements because they did not want any such statement to be leaked to Above The Law. The Committee then directed the participants on the call not to discuss the matter further.

**ANSWER:** The firm denies the allegations in Paragraph 69 of the FAC.

70. Ms. Miller, who was pushing for a formal apology and investigation, was terminated shortly after this Committee call.

**ANSWER:** The firm denies the allegations in Paragraph 70 of the FAC.

71. Ms. Miller also explained to Ms. Ogedegbe that the reason she was pushing so hard for the apology was because she had observed her friend and former colleague, "Jane Doe"– a Black lawyer who predated Ms. Ogedegbe and who was also the only Black female attorney in the Chicago office during her employment – being subjected to discrimination such as Partners not responding to her emails, disparate work allocations, exclusion and an inability to find a mentor.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations pertaining to what Miller allegedly said to her. The firm denies the remaining allegations in Paragraph 71 of the FAC.

72. Upon her return from the Associate retreat, one of Ms. Ogedegbe's first assignments from Ms. Mazur was to create a compliance plan for credentialing, peer review and patient safety.

**ANSWER:** The firm admits the allegations in Paragraph 72 of the FAC, but states that the assignment was to evaluate certain options in relation to a client's credentialing program.

73. In making this request, Ms. Mazur explained that it would be a great opportunity for Ms. Ogedegbe to establish herself as a Firm "expert" on these matters because the prior "expert" on these matters was a Partner who had left the Firm.

**ANSWER:** The firm admits that Mazur told Ogedegbe that peer review and credentialing were two areas where she would like Ogedegbe to focus. The firm denies the remaining allegations in Paragraph 73 of the FAC.

74. After delivering strong work and receiving glowing reviews from the client, the supervising partner, Amanda Enyeart, said the client was so impressed with Ms. Ogedegbe's work that they requested additional work in the form of a comprehensive 50-state survey.

**ANSWER:** The firm admits that Enyeart informed Ogedegbe that the client "liked your first work, so they're coming back for more, with a different focus." The firm further admits that the client requested a comprehensive 50-state survey. The firm denies the remaining allegations in Paragraph 74 of the FAC.

75. Ms. Enyeart acknowledged that it would be most appropriate for Ms. Ogedegbe to lead the group of Associates assigned to this project given that it was her underlying work that generated the business. However, once the project commenced, Ms. Enyeart reassigned the leadership role to a white Associate. It soon became clear that Ms. Enyeart had planned all along to appropriate Ms. Ogedegbe's work and brand herself as the "expert."

**ANSWER:** The firm denies the allegations in Paragraph 75 of the FAC.

76. To make matters worse, it also became clear that there was no additional meaningful work for Ms. Ogedegbe on the Digital Health team. The Partners that hired her shunned Ms. Ogedegbe's requests for work and she was excluded from key meetings, projects, trainings and mentorship opportunities. They even excluded Ms. Ogedegbe's name from an article that she co-authored on December 23, 2022.

**ANSWER:** The firm denies the allegations in Paragraph 76 of the FAC.

77. The only Partners who gave Ms. Ogedegbe work on a somewhat consistent basis were Black men, and one of the very few white lawyers known to support the development of minority lawyers at the Firm, Gregory Fosheim.

**ANSWER:** The firm denies the allegations in Paragraph of 77 of the FAC.

## III. DISCRIMINATION PERSISTS DURING MS. OGEDEGBE'S FIRST YEAR AT MWE

78. In January 2023, Ms. Ogedegbe was again reminded that the discrimination to which she was subjected was part and parcel to a broader culture of discrimination against Black lawyers.

**ANSWER:** The firm denies the allegations in Paragraph 78 of the FAC.

79. Specifically, Ms. Ogedegbe connected with Jane Doe, a former Black female lawyer at the Firm, on LinkedIn. Ms. Doe, who worked in the Chicago office from October 2019 to March 2021, and was the only Black female attorney in Chicago at the time, warned Ms. Ogedegbe about the toxic experience she had while working in the Firm's Health and Digital Health Groups. Like Ms. Ogedegbe, Ms. Doe confirmed that she too was lied to about her opportunities at MWE and that her work was similarly misappropriated, after which the Firm's white Partners refused to give her work and ignored her efforts to obtain it.

**ANSWER:** The firm admits that there was one Black female attorney in Chicago from October 2019 to March 2021. The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations pertaining to her LinkedIn connection or conversations

with this individual. The firm denies that there was only one Black female attorney at the firm in 2021 in its entirety and denies the remaining allegations in Paragraph 79 of the FAC.

80. On January 30, 2023, a few days after connecting with Ms. Doe, Ms. Ogedegbe reached out to Edith Gondwe, the Firm's Diversity and Inclusion Director. Ms. Ogedegbe expressed her concerns about the discriminatory treatment to which she had been subjected, and Ms. Gondwe expressed her frustration that the Chicago office was continuing to exhibit exclusionary behavior towards Black lawyers.

**ANSWER:** The firm denies the allegations in Paragraph 80 of the FAC.

81. On February 3, 2023, Ms. Gondwe forwarded Ms. Ogedegbe and her concerns to members of the Diversity Committee and HR.

**ANSWER:** The firm denies the allegations in Paragraph 81 of the FAC.

82. After being pressured by the Diversity Committee and HR, Partners in the Digital Health practice finally took the most basic steps necessary to integrate Ms. Ogedegbe into the team.

**ANSWER:** The firm admits that partners on the Digital Health team took steps to integrate Ogedegbe into the group upon her hire and thereafter. The firm denies the remaining allegations in Paragraph 82 of the FAC.

83. For instance, on February 2, 2023, four months after Ms. Ogedegbe joined the MWE, the Firm finally sent out an email "welcoming" her to the Firm. This delay was completely inappropriate, as the Firm always prioritizes such welcome emails for non-Black Associates, including for various non-Black Associates who started after Ms. Ogedegbe but had their welcome emails sent before hers. Far from being merely symbolic, these welcome emails are a critical means of introduction to the Firm and to help new Associates obtain work.

**ANSWER:** The firm admits that the welcome email for Ogedegbe was delayed due to a process-related oversight error. The firm further admits that it sent welcome emails for several non-Black associates who were hired after Ogedegbe shortly before hers. The firm states further that those welcome emails were also delayed and, in one case, was never sent out. The firm denies the remaining allegations in Paragraph 83 of the FAC.

84. Three days later, on February 6, 2023, Ms. Ogedegbe finally had her first 1:1 calls with the leaders of the Digital Health group – again, four months after she joined the Firm.

Although these half-hearted measures helped in the short term, they ultimately failed to remedy the effects of the past and ongoing discrimination.

**ANSWER:** The firm denies the allegations in Paragraph 84 of the FAC.

85. In early 2023, the Firm created new internal policies (formalized in 2024) that resulted in the exclusion of diverse Associates at business conferences, both because they had a disparate impact on Black attorneys and also because they were applied discriminatorily. The policy ostensibly required Associates who were looking to attend a conference to write up a business plan in which they demonstrated that they had significant relationships with several attending clients or would bring in new clients to attend the conference.

**ANSWER:** The firm admits that in March 2023, the Health practice group announced a policy requiring all Health associates to submit a business plan for consideration in connection with "signature event" attendance requests. The firm denies the remaining allegations in Paragraph 85 of the FAC.

86. Ms. Gondwe and many members of the Diversity Committee complained that this policy was discriminatory because, as a result of institutional discrimination, Black Associates at MWE were less likely to have these relationships and their exclusion from the conferences deprived them of opportunities to develop them.

**ANSWER:** The firm denies the allegations in Paragraph 86 of the FAC.

87. On top of that, when Ms. Ogedegbe reached out to the Director of Business Development, Julia Berman, for assistance, she was initially brushed aside.

**ANSWER:** The firm admits that Ogedegbe reached out to and met with Director of Business Development, Julia Berman. The firm denies the remaining allegations in Paragraph 87 of the FAC.

88. Ultimately, Ms. Ogedegbe engaged in extensive networking, cultivated strong client leads and invited the prospective clients to the Firm's Digital Health Forum. As a result, the Partners in the Digital Health group were forced to approve her attendance.

**ANSWER:** The firm admits that Ogedegbe's request to attend the 2023 Digital Health Forum was approved. The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 88 of the FAC. The firm denies the remaining allegations in Paragraph 88 of the FAC.

89. However, when she arrived, she learned that many non-Black Associates were approved to attend without putting together the requisite business plan. Instead, they were just invited by non-Black Partners to attend the conference and client meetings to help those non-Black Associates develop client relationships that they did not already have. In contrast, despite the fact that she earned her way into attendance, the Digital Health Partners in attendance excluded her from their client meetings.

**ANSWER:** The firm denies the allegations in Paragraph 89 of the FAC.

90. In mid-2023, the Firm hired Theresa Thompson. Part of Ms. Thompson's role was to address discriminatory work allocation at the Firm. In order to help in this regard, Ms. Thompson asked Associates to identify areas of interest to ensure that they received appropriate access/invitations to relevant listservs, events meetings, etc., as well as the opportunity to make connections with relevant attorneys at the Firm.

**ANSWER:** The firm admits that Theresa Thompson was hired in approximately February 2023 and further admits that Thompson made certain inquiries to associates as alleged. The firm denies the remaining allegations in Paragraph 90 of the FAC.

91. Ms. Ogedegbe completed the survey and indicated an interest in transactional and regulatory/digital health matters. Shortly thereafter, in June 2023, a Chicago Partner, Monica Wallace, led a healthcare "bootcamp" training. The Firm itself described this training as "a key initiative that impacts a significant component of our practice . . . [and] an investment in each of you and an investment in the Firm." Ms. Ogedegbe was inexplicably excluded from the training, whereas a more junior white Associate, Angela Theodoropoulos, was invited. When Ms. Ogedegbe complained about this discriminatory exclusion, no one was able to provide a coherent explanation.

**ANSWER:** The firm admits the first three sentences in Paragraph 91 of the FAC, except states that the training took place in August 2023. The firm denies the remaining allegations in Paragraph 91 of the FAC.

92. Around this same time, Ms. Thompson recommended that Ms. Ogedegbe reach out to Jennifer Geetter, a Digital Health Partner based in Washington, D.C. According to Ms. Thompson, Ms. Geetter expressed a need for staffing on certain client projects.

**ANSWER:** The firm admits the allegations in Paragraph 92 of the FAC.

93. Unfortunately, Ms. Geetter began to treat Ms. Ogedegbe with discriminatory hostility, including microaggressions such as finding fault in Ms. Ogedegbe's work and doubting the accuracy of her conclusions, only to concede after being corrected by a non-Black attorney, that it was she (Ms. Geetter) who was wrong.

**ANSWER:** The firm denies the allegations in Paragraph 93 of the FAC.

94. Moreover, despite supposedly finding fault in Ms. Ogedegbe's work, Ms. Geetter appropriated it as her own and used it verbatim.

**ANSWER:** The firm admits that Geetter found fault with Ogedegbe's work. The firm denies the remaining allegations in Paragraph 94 of the FAC.

95. In addition, Ms. Geetter set unreasonable and impossible to meet deadlines for Ms. Ogedegbe.

**ANSWER:** The firm denies the allegations in Paragraph 95 of the FAC.

96. Ms. Geetter did not treat white Associates the same way, and Ms. Ogedegbe would later learn that Ms. Geetter had a history of discriminating against Black Associates.

**ANSWER:** The firm denies the allegations in Paragraph 96 of the FAC.

97. In August 2023, Ms. Ogedegbe was finally permitted to move to the Miami office. However, she was told before she even got there that the team in Miami would give her very little work.

**ANSWER:** The firm admits that Ogedegbe was permitted to transfer to the Miami office in approximately August 2023 at her request. The firm denies the remaining allegations in Paragraph 97 of the FAC.

98. The Partners that she was physically leaving behind in Chicago retaliated against her by assigning her non-billable work, including to write, present, and publish an article. Incredibly, when the article was published, the Firm failed to include Ms. Ogedegbe's name and instead mistakenly included the name of a totally different Nigerian Associate who worked out of the D.C. office. There is no more egregious example of the "all Black people are the same" attitude at the Firm than this.

**ANSWER:** The firm denies the allegations in Paragraph 98 of the FAC.

99. When Ms. Ogedegbe finally moved, the Firm provided no relocation assistance and Senior HR Manager Kelly Lawson misspelled her name on the transfer form and provided the wrong office number – in fact, the identified office was empty – in the internal announcement. Moreover, Ms. Ogedegbe's arrival was announced on the wrong day.

**ANSWER:** The firm admits that relocation assistance is not provided when associates request a voluntary transfer, as was the case with Ogedegbe. The firm further admits that clerical

errors were made including the misidentification of her office number and Senior HR Manager Kelly Lawson inadvertently misspelling Ogedegbe's name, which were remedied. The firm further admits that the mistakenly identified office was empty. The firm denies the remaining allegations in Paragraph 99 of the FAC.

100. Given that Ms. Ogedegbe was not permitted to receive work from the Partners in Miami, she was supposed to continue receiving work from the Partners in Chicago. Instead, her work drastically decreased, and her hours dropped significantly.

**ANSWER:** The firm admits that in approximately late 2024, Ogedegbe's work and hours dropped significantly. The firm denies the remaining allegations in Paragraph 100 of the FAC.

101. In an effort to stay connected, Ms. Ogedegbe made the modest request to meet with Ms. Mazur for a mere 15 minutes per month. This request was rejected.

**ANSWER:** The firm denies the allegations in Paragraph 101 of the FAC.

102. To put a nail in the coffin for her opportunity to get meaningful work from the Miami Partners, Ms. Mazur told the Miami Partners, including Dana Dombey, not to work with Ms. Ogedegbe. She further slandered Ms. Ogedegbe to the Miami Partners by telling them (falsely and without any examples) that her work product was inaccurate and that she had to write off large portions of Ms. Ogedegbe's time.

**ANSWER:** The firm denies the allegations in Paragraph 102 of the FAC.

103. The sabotage was successful. During Ms. Ogedegbe's 2023 evaluation, held by Bernie Grondin (former Miami Health Partner In Charge) and Ms. Dombey (who was recently promoted to the Miami Health Partner In Charge), Mr. Grondin asked Ms. Ogedegbe about her goals at the Firm, and then immediately indicated that she would be unable to accomplish the goals she articulated, which were only to specialize in transactions and regulatory Health matters (similar to Ms. Dombey, who is white).

**ANSWER:** The firm admits that Ogedegbe's 2023 evaluation was held by Grondin, who was the former Miami Health Partner in Charge, and Dombey, who had been promoted to the Miami Health Partner in Charge, and that Grondin asked Ogedegbe about what she hoped to achieve in the short- and longer-term at the firm. The firm denies the remaining allegations in Paragraph 103 of the FAC.

104. Shortly thereafter, Mr. Grondin asked Ms. Ogedegbe to work on an assignment, but once he obtained what he needed from her (a strategic roadmap to structure telehealth companies in all 50 states and a template for a professional services agreement), he dropped her from the project and worked on it with Ms. Dombey.

**ANSWER:** The firm admits that shortly thereafter, Grondin asked Ogedegbe for her assistance in connection with a pitch. The firm denies the remaining allegations in Paragraph 104 of the FAC.

## IV. MS. OGEDEGBE'S PERFORMANCE WAS OUTSTANDING DESPITE HAVING TO NAVIGATE A DISCRIMINATORY AND RETALIATORY ENVIRONMENT

105. Despite having to work in a discriminatory environment riddled with the challenges described above, Ms. Ogedegbe's performance ratings for 2023 were very good, and the overall rating was "Strong," which means that she was an "Associate[ ] who consistently me[ ]t or exceed[ed] the high expectations of McDermott Associates."

**ANSWER:** The firm admits that Ogedegbe's overall rating for 2023 was "strong", and that rating means an Associate "consistently me[]t or exceed[ed] the high expectations of McDermott Associates." The firm denies the remaining allegations in Paragraph 105 of the FAC.

106. She also received a discretionary special bonus.

**ANSWER:** The firm admits that Ogedegbe received a discretionary bonus based primarily on hours for 2023. The firm denies any remaining allegations in Paragraph 106 of the FAC.

107. Comments on her review included, inter alia,

- There have been several instances where Ashley produced high quality work product.
- She is also highly responsive and delivered the work on a tight timeline.
- Ashley is doing a strong job as the associate managing transactions for a PPM client. She moves the process along seamlessly, is super responsive, and her work is always timely and client-ready.
- Ashley's questions are thoughtful and she's great at managing teams– subject matter specialists and a paralegal have all reached out to comment on how great it is to work with Ashley.

- Ashley did an excellent job stepping in on short notice in the middle of a very large and complex transaction where she served as the lead associate on the transaction. She did great at researching regulatory schemes and managed a team of specialists and associates on due diligence and ancillary transaction documentation. She stayed organized, was timely, and worked closely with the client over several months to close the transaction

- Ashley has demonstrated excellent project management skills with limited supervision.

- Ashley has an excellent handle on corporate practice of medicine matters.

- Ashley has demonstrated excellent skills in drafting physician practice management agreements.

- On a complex transaction, Ashley provided excellent leadership of the diligence team that was comprised of Partners and Associates.

- Ashley has been a significant contributor to the digital health practice.

- Quietly steady. Well-organized. Trustworthy. Excellent writer and communicator. I really appreciated how she took on a huge role for a major transaction in her first days with the firm and was unafraid to set deadlines and communicate expectations in a clear and supportive way.

**ANSWER:** The firm admits that certain comments were made regarding Ogedegbe in the "Strengths" section of her 2023 performance reviews and to Ogedegbe as stated in Paragraph 107 of the FAC. The firm denies that the allegations contained in Paragraph 107 represent Ogedegbe's performance reviews or performance-related communications accurately or in their entirety. The firm denies the remaining allegations in Paragraph 107 of the FAC.

108. Ms. Ogedegbe began working with Stephen Reynolds, a Black Chicago-based Capital Partner who specialized in privacy/cybersecurity. Mr. Reynolds started giving Ms. Ogedegbe work around January 2024. He was immediately impressed with Ms. Ogedegbe's writing and research skills and quickly increased her workload.

**ANSWER:** The firm admits the allegations in the first two sentences of Paragraph 108 of the FAC. The firm further admits that Reynolds increased Ogedegbe's workload. The firm denies the remaining allegations in Paragraph 108 of the FAC.

109. Ms. Ogedegbe confided in Mr. Reynolds with respect to her prior challenges with the Firm. He encouraged her to stay at MWE and specifically mentioned that he had several large health and life sciences clients with which he could leverage Ms. Ogedegbe's skillset.

**ANSWER:** The firm admits that Ogedegbe told Reynolds that she was having a difficult time getting enough work. The firm further admits that Reynolds encouraged Ogedegbe not to leave. The firm denies the remaining allegations in Paragraph 109 of the FAC.

110. Meanwhile, however, the Partners in Miami failed to give Ms. Ogedegbe opportunities for meaningful work, and when she did receive work, it was accompanied by discrimination.

**ANSWER:** The firm denies the allegations in Paragraph 110 of the FAC.

111. By way of example, when Ms. Ogedegbe was assigned to work with Partner Matt Friendly, Mr. Friendly constantly underestimated her skills and experience and often confused Ms. Ogedegbe with the Nigerian Associate who worked out of the D.C. office. Mr. Friendly also scapegoated Ms. Ogedegbe for the mistakes of another MWE Partner, Stephanie DeGennaro, even admitting that he "couldn't blame the Income Partner and ultimately needed [Ms. Ogedegbe] to be the fall person."

**ANSWER:** The firm denies the allegations in Paragraph 111 of the FAC.

112. In mid-2024, Ms. Ogedegbe was asked to work on hospital bankruptcy transactions with Jay Greathouse (Partner), Paul Lawrence (Partner) and Rosalyn Broad (white Associate, same year as Ms. Ogedegbe).

**ANSWER:** The firm admits the allegations in Paragraph 112 of the FAC.

113. Ms. Broad had confided in Ms. Ogedegbe that she did not have transactions experience, but she was nonetheless promoted to the lead Associate role for the transactions despite the fact that Ms. Ogedegbe had significant experience with transactions.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning what Broad told Ogedegbe. The firm denies the remaining allegations in Paragraph 113 of the FAC.

114. Ms. Ogedegbe's first assignment was to lead a Louisiana-based transaction. When the assignment was given to her, Mr. Greathouse conveyed that it would be impossible to accomplish – indeed, it was an assignment with a two-day turnaround that would typically take two months to complete – and that she should just "do [her] best." He also noted that most of the Associates who would otherwise be available to help were tied up with other matters. Of the

Associates that were able to help, all were immediately approved other than Karis Jackson, a Black Associate in Washington, D.C. who was only approved after additional steps.

**ANSWER:** The firm denies the allegations in Paragraph 114 of the FAC.

115. Ultimately, under Ms. Ogedegbe's leadership, the team completed the assignment, to the shock of Mr. Greathouse.

**ANSWER:** The firm denies the allegations in Paragraph 115 of the FAC.

116. Ms. Ogedegbe would later learn that every other jurisdiction was staffed with a team that included at least two midlevel and/or senior Associates, whereas she was the only one in Louisiana, which evidences further discriminatory resource allocation.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations pertaining to what she allegedly learned. The firm denies the remaining allegations in Paragraph 116 of the FAC.

117. Indeed, as it turned out, Messrs. Greathouse and Lawrence never expected that a buyer would materialize in connection with the Louisiana hospital, which is why they understaffed it. As luck would have it, a buyer did materialize, at which point Messrs. Greathouse and Lawrence shifted all of their resources into Louisiana and pushed Ms. Ogedegbe out of her leadership role and into a "behind the scenes" role that consisted of, *inter alia*, preparing her white colleagues to sound competent on calls on which Ms. Ogedegbe was not permitted to participate.

**ANSWER:** The firm admits that the hospital was purchased. The firm denies the remaining allegations in Paragraph 117 of the FAC.

118. Ms. Ogedegbe was also cut out of communications between Ms. Broad and the members of her own team, during which Ms. Broad and another white Associate, Kelsey Reinhardt, insulted and undermined Ms. Ogedegbe.

**ANSWER:** The firm denies the allegations in Paragraph 118 of the FAC.

119. Ultimately, because of the ignorance of Mr. Greathouse, Mr. Lawrence and Ms. Broad, the work that Ms. Ogedegbe had done was unnecessarily redone in a way that was not only objectively worse but also violated FTC antitrust rules by unredacting certain sensitive information.

**ANSWER:** The firm denies the allegations in Paragraph 119 of the FAC.

120. Ultimately, Mr. Greathouse told Ms. Ogedegbe that her leadership role on the project was "not working out" and that he needed Ms. Broad and Ms. Reinhardt, two white women, to lead the transaction.

**ANSWER:** The firm admits that Greathouse told Ogedegbe that her leadership role on the project was not working out. The firm denies the remaining allegations in Paragraph 120 of the FAC.

121. Not surprisingly, Mr. Greathouse was unable to articulate a single reason for this decision.

**ANSWER:** The firm denies the allegations in Paragraph 121 of the FAC.

122. Mr. Greathouse admitted that Ms. Ogedegbe had done a great job on the transaction – in fact, he was so impressed by her work that he initially planned to have her lead eight Florida-based transactions – and the most coherent explanation that he provided for her removal was, "sometimes there isn't a reason."

**ANSWER:** The firm denies the allegations in Paragraph 122 of the FAC.

123. Two days later, apparently realizing that Ms. Broad and Ms. Reinhardt were entirely unqualified to lead the transaction, Mr. Greathouse insisted that Ms. Ogedegbe review and correct their work, and answer their questions to help get them up to speed from "behind the scenes."

**ANSWER:** The firm admits that Greathouse told Ogedegbe to be available to answer questions from associates working on the project. The firm denies the remaining allegations in Paragraph 123 of the FAC.

124. Ms. Ogedegbe subsequently complained in writing, and Mr. Greathouse fabricated new reasons for his discriminatory decisions; namely, that Ms. Ogedegbe's performance on the transaction was lacking. This pretextual justification is entirely undermined by his repeated acknowledgments of her superior performance.

**ANSWER:** The firm admits that Ogedegbe subsequently complained in writing. The firm denies the remaining allegations in Paragraph 124 of the FAC.

125. The reality is that when an opportunity for substantial work arose – an opportunity created by Ms. Ogedegbe – the Firm discriminatorily removed her from her leadership role in favor of a white Associate. In addition, after Ms. Ogedegbe documented Mr. Greathouse's misconduct, he removed her from internal listservs, weekly calls and an internal ShareFile related to the transaction.

**ANSWER:** The firm admits that Ogedegbe was removed from internal listservs and an internal Sharepoint related to the transaction once she was no longer working on it. The firm further

admits that Greathouse told Ogedegbe that he would find another role for her skillset. The firm denies the remaining allegations in Paragraph 125 of the FAC.

126. The discrimination was so obvious that even an outside banker, Nick Davis with Cain Brothers, called out the MWE team for passing off Ms. Ogedegbe's work as their own.

**ANSWER:** The firm denies the allegations in Paragraph 126 of the FAC.

## V. MS. OGEDEGBE ENGAGES IN PROTECTED ACTIVITY AND SUFFERS RETALIATION

127. As noted above, when Ms. Ogedegbe was largely removed from her role on the Louisiana deal, her white colleagues were given significantly more support than had been given to her. One of the additional lawyers put on the project was Ms. Theodoropoulos.

**ANSWER:** The firm denies the allegations in Paragraph 127 of the FAC.

128. On June 28, 2024, Ms. Theodoropoulos told Ms. Ogedegbe that she noticed she had been removed from various communications concerning the Louisiana transaction, and asked Ms. Ogedegbe what was going on. Ms. Ogedegbe confided in Ms. Theodoropoulos. She told Ms. Theodoropoulos that she felt like a hidden figure, and that she believed that there was a concerted effort by Messrs. Greathouse and Lawrence to replace Ms. Ogedegbe with their all-white team with respect to the public-facing leadership role the moment they learned that the Louisiana deal had a buyer and thus presented a lucrative opportunity.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 128 of the FAC.

129. Ms. Ogedegbe went on to tell Ms. Theodoropoulos about her experience as a Black woman at the Firm, including that it had already been hard enough for her to get work. She explained that she had close Black female friends leave the Firm for the same reasons and that she now felt like she was getting pushed out as well.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 129 of the FAC.

130. Ms. Theodoropoulos noted that she recalled how challenging it was for Ms. Ogedegbe in Chicago and encouraged Ms. Ogedegbe to raise these issues to HR.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 130 of the FAC.

131. For her part, Ms. Ogedegbe did not trust HR because it had known about the issues for years – including Ms. Lawson, to whom Ms. Ogedegbe had complained about discrimination– and no lasting remedial action had ever been taken.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegations concerning whether she trusted HR. The firm denies the remaining allegations in Paragraph 131 of the FAC.

132. Then, on July 10, 2024, Ms. Lawson reached out to Ms. Ogedegbe unsolicited. Ms. Lawson explained that she had heard some concerning comments that the Firm took seriously, and that she wanted to speak with Ms. Ogedegbe.

**ANSWER:** The firm admits the allegations in Paragraph 132 of the FAC.

133. On the same day, Ms. Theodoropoulos texted Ms. Ogedegbe and said that she believed that a junior Associate had complained about Ms. Ogedegbe being removed from the Louisiana transaction. Ms. Ogedegbe would later learn that Ms. Theodoropoulos was lying, and that she knew very well that it was Mr. Greathouse – the individual whom Ms. Ogedegbe accused of misconduct – that went to HR.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 133 of the FAC.

134. In any event, on July 11, 2024, after Ms. Lawson was intentionally deceptive about the purpose of the meeting, Ms. Ogedegbe met with her and a third person who was not on the meeting invite. Apparently, the call was recorded.

**ANSWER:** The firm admits that on or about July 11, 2024, Ogedegbe met with Lawson and the HR Manager for the Miami office, who was not on the meeting invite. The firm denies the remaining allegations in Paragraph 134 of the FAC.

135. During the call, Ms. Lawson's tone was accusatory. She immediately lied and said that Ms. Theodoropoulos reported her conversation to HR and then began asking questions about cherrypicked quotations from Ms. Ogedegbe's conversation with Ms. Theodoropoulos. She refused to provide any context as to the purpose of the questioning and simply said that she was following Firm procedure as dictated by MWE's General Counsel.

**ANSWER:** The firm admits that Lawson told Ogedegbe that she was following Firm procedure consistent with the firm's General Counsel in denying Ogedegbe's request for the

questions she would be asked in advance. The firm denies the remaining allegations in Paragraph 135 of the FAC.

136. Ms. Lawson went on to ask whether Ms. Ogedegbe believed that she was removed from the Louisiana deal for discriminatory purposes, and whether she felt it was harder to get work at the Firm as a Black woman. Ms. Ogedegbe replied, yes, and noted that the discrimination had been documented for over two years.

**ANSWER:** The firm admits that Ogedegbe was asked whether she felt that it was harder to get work at the Firm because she was a Black woman and that she answered that it was. The firm further admits that Ogedegbe said that it was "well documented" but declined to give examples. The firm denies the remaining allegations in Paragraph 136 of the FAC.

137. After a sham "investigation," HR predictably concluded that there was no discrimination. Junior Associate Kyle Hafkey – who was interviewed before Ms. Ogedegbe ever spoke with HR – later admitted that he and others were too scared to be honest with HR when being interviewed, and that Ms. Theodoropoulos and others threatened the Junior Associates, saying that if they were honest and supportive of Ms. Ogedegbe they would lose hours and, ultimately, their jobs.

**ANSWER:** The firm lacks knowledge or information sufficient to form a belief about the truth of Ogedegbe's allegation concerning what Hafkey stated. The firm denies the remaining allegations in Paragraph 137 of the FAC.

138. For her part, Ms. Theodoropoulos was put into higher visibility roles as a "reward" for tipping off Mr. Greathouse about Ms. Ogedegbe's concerns about discrimination. For their part, Messrs. Greathouse and Lawrence were rewarded for bringing in massive revenues on the back of Ms. Ogedegbe's work, for which she received nothing.

**ANSWER:** The firm denies the allegations in Paragraph 138 of the FAC.

139. It bears noting that during all of this, on August 29, 2024, the team received a preservation notice in connection with their work with the Louisiana transaction. Later that very same day, Mr. Greathouse claimed to have never received the notice (which he said was "awesome") and Ms. Broad confided that she never saved emails to the system (and that she would not do so because it would take too long). During the call, one member of the team Reuben Bank, said that the preservation notice was "scary" because it directed the team not to alter documents. He followed this up by saying, "I'm gonna alter some documents." Mr. Greathouse responded, "you can alter the documents." Then, Ms. Theodoropoulos said that her emails responsive to the preservation notice were "in the trash," which resulted in laughter from the team.

**ANSWER:** The firm admits that, unrelatedly, on or about August 29, 2024, the team received a preservation notice in connection with the client for whom the team was doing work on the Louisiana transaction. The firm further admits that the preservation notice stated that documents and data "must be preserved and retained (i.e., must not be altered, deleted, or otherwise modified), even if the documents and/or data are in draft form…." The firm further admits that statements were made that the notice had not been seen, documents needed to be worked on and thus altered in the course of working on the transaction, and some emails were in the trash and/or not saved to the system because it would take too long. The firm denies that the preservation notice was not followed and further denies any remaining allegations in Paragraph 139 of the FAC.

140. Following HR's investigation, Ms. Ogedegbe was subjected to repeated and escalating retaliation.

**ANSWER:** The firm denies the allegations in Paragraph 140 of the FAC.

141. By way of only one example, Mr. Greathouse was forced, for a short period of time, to include Ms. Ogedegbe in certain meetings from which she had been removed. He nonetheless effectively excluded her by meeting with the rest of the team in advance of said meetings to discuss substantive matters. Once Ms. Ogedegbe was invited into the meetings, the Louisiana transaction was not even discussed. Mr. Greathouse eventually just cancelled the existing meetings and created new ones, from which Ms. Ogedegbe was excluded.

**ANSWER:** The firm admits that Ogedegbe no longer was included in substantive discussions related to the transaction on which she was no longer working but continued to be invited to certain check-in meetings. The firm denies the remaining allegations in Paragraph 141 of the FAC.

142. Ironically, even after all of the above, one of the very few assignments that Ms. Ogedegbe was given was to fix errors in the work of Mr. Greathouse's team. Mr. Greathouse would not even give this assignment to Ms. Ogedegbe directly, instead having Partner Andrea Zazulia convey the task.

**ANSWER:** The firm admits that Zazulia conveyed the assignment to Ogedegbe. The firm denies the remaining allegations in Paragraph 142 of the FAC.

143. In short, Ms. Ogedegbe was asked to identify who, among over 300 physicians, Mr. Greathouse's team failed to identify in connection with its due diligence.

**ANSWER:** The firm admits that Ogedegbe was offered a project of verifying the facility to which 100+ physicians were assigned. The firm denies the remaining allegations in Paragraph 143 of the FAC.

144. Ms. Ogedegbe informed Ms. Zazulia that she had not worked on the transaction in months, did not work on the physician list and no longer had access to the deal data room or team files.

**ANSWER:** The firm admits that Ogedegbe informed Zazulia that she had not worked on the transactions for nearly two months, no longer had access to the OneDrive for the various markets and that other individuals had worked on the disclosures. The firm denies any remaining allegations in Paragraph 144 of the FAC.

145. In response, Ms. Zazulia absurdly suggested that Ms. Ogedegbe attempt to piece the information together using Google searches.

**ANSWER:** The firm admits that Zazulia stated that, among other things, a website Google search should be done to confirm employment status of the physicians. The firm denies the remaining allegations in Paragraph 145 of the FAC.

146. As it turned out, Mr. Greathouse's all white team not only dropped the ball on this but actually failed to identify an entire hospital facility and its contracts (e.g., employment agreements, vendor agreements, etc.), in deal disclosure statements.

**ANSWER:** The firm denies the allegations in Paragraph 146 of the FAC.

147. Ultimately, Ms. Zazulia determined that it made no sense for Ms. Ogedegbe to perform the task initially assigned, yet Ms. Ogedegbe was subsequently criticized for not being a "team player."

**ANSWER:** The firm denies the allegations in Paragraph 147 of the FAC.

148. Ms. Ogedegbe made a follow-up complaint to HR about this ongoing discrimination and retaliation, but no remedial action was taken.

**ANSWER:** The firm admits that Ogedegbe made a follow-up complaint to HR about the requested assignment. The firm denies the remaining allegations in Paragraph 148 of the FAC.

149. Meanwhile, on October 16, 2024, during a Diversity Committee meeting, various Partners expressed concerns regarding the Firm's historical failure to support, promote and retain diverse attorneys. They noted that the diverse attorneys that were hired between 2020-2024 were disproportionately terminated at a near 1:1 ratio (i.e., one in and one out). In other words, diverse attorneys were leaving the Firm as quickly as they were being hired.

**ANSWER:** The firm admits that a Diversity Committee meeting took place on October 16, 2024, at which the retention of diverse attorneys was discussed. The firm denies the remaining allegations in Paragraph 149 of the FAC.

## VI. MS. OGEDEGBE'S PERFORMANCE CONTINUES TO BE OUTSTANDING, BUT SHE IS ULTIMATELY TERMINATED IN RETALIATION FOR HER COMPLAINTS

150. It is a testament to her perseverance that Ms. Ogedegbe continued to perform at a high level throughout 2024 and into 2025 and received another discretionary special bonus for 2024.

**ANSWER:** The firm admits that Ogedegbe received a second discretionary bonus for 2024, based primarily on hours. The firm denies the remaining allegations in Paragraph 150 of the FAC.

151. Examples of praise heaped upon her by Partners and in her 2024 performance review includes, among many, many other accolades, the following:

- August 3, 2024, Partner Greg Fosheim, "Thanks, Ashley. I am happy to submit a glowing evaluation for you. You've been a valued colleague this year – and [for] several years now."
- October 9, 2024, Partner Jamie Gelfman, describing Ms. Ogedegbe's work product as "perfect."
- January 1, 2025, Partner Danielle Golino, "You[r] comments to [documents] look great!"
- February 16, 2025, Mr. Fosheim, "From my perspective you are doing everything right to make my review as easy as possible."

- February 21, 2025, Mr. Fosheim, "Thank you, thank you, thank you . . . I know how incredibly competent you are and how much I trust and value your abilities."

- March 21, 2025, Mr. Fosheim, "This looks great, Ashley. Thank you."

- Ashley has a professional presence in meetings that is important for clients facing a cybersecurity incident. She is also very skilled with incident response communications.

- Ashley has provided valuable assistance on healthcare transactions. She has helped to spot issues on transactions and anticipate possible issues before they arise. Ashley exhibits strong written communication skills and can be trusted to prepare client-ready emails.

- Ashley did a stellar job at jumping in on a difficult pro bono case, quickly understanding the law and underlying issues, and communicating with the client. Her research and written product, as well as her communication with the client and opposing counsel, were professional and well thought-out. Her efforts ultimately led to a favorable conclusion for a very happy client.

- Ashley is well-organized and is confident in her skills. And her intelligence and legal skills cross many subsectors. Whenever I need a senior associate with scientific experience and creative problem solving abilities, I turn to Ashley.

- Ashley did a lot of legal research on our transaction and was extremely thorough in the research tasks given to her and in handling our closing. Ashley demonstrated teamwork and leadership by working long hours and managed working with attorneys and paralegals in other offices. I am appreciative of the work Ashley did on our deal.

- Ashley demonstrates strong organizational skills and at times has helped the broader healthcare transactions team stay on track with assignments and items on transactions. She has a good handle on the steps necessary to consummate transactions and the ancillary documents that need to be drafted and negotiated.

- I have often recommended Ashley to colleagues in different offices or different practice groups, and I do not hesitate to get her involved with client-facing work.

**ANSWER:** The firm admits that certain comments were made regarding Ogedegbe in the "Strengths" section of her 2024 performance review and to Ogedegbe in other communications as stated in Paragraph 151 of the FAC. The firm denies that the allegations contained in Paragraph 151 represent Ogedegbe's performance reviews or performance-related communications

accurately or in their entirety. The firm denies any remaining allegations in Paragraph 151 of the FAC.

152. In addition to all of the foregoing, in the Fall of 2024, Mr. Reynolds attempted to have Ms. Ogedegbe transferred into his group, in large part because she was so successful at helping him prepare pitches that generated millions of dollars in revenues. The Healthcare group retaliatorily blocked the transfer.

**ANSWER:** The firm denies the allegations in Paragraph 152 of the FAC.

153. Unfortunately, the individuals who were the subject of Ms. Ogedegbe's discrimination complaints were able to sabotage her overall performance rating by adding false and retaliatory performance criticisms into the review. Only a few months later, on March 27, 2025, Ms. Ogedegbe was unceremoniously terminated in retaliation for engaging in protected activity.

**ANSWER:** The firm denies the allegations in Paragraph 153 of the FAC.

154. Outrageously, the Partners that Ms. Ogedegbe worked for most frequently, Mr. Reynolds and Mr. Fosheim, were not even notified about the decision to terminate Ms. Ogedegbe.

**ANSWER:** The firm denies the allegations in Paragraph 154 of the FAC.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of 42 U.S.C. § 1981
### (Against All Defendants)

155. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

156. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, subjecting Plaintiff to disparate treatment.

**ANSWER:** The firm denies the allegations in Paragraph 156 of the FAC.

157. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, creating a hostile work environment for Plaintiff.

**ANSWER:** The firm denies the allegations in Paragraph 157 of the FAC.

158. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 158 of the FAC.

159. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 159 of the FAC.

160. Defendant's discriminatory treatment constitute malicious, willful and wanton violation of § 1981 for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** The firm denies the allegations in Paragraph 160 of the FAC.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of 42 U.S.C. § 1981**
**(Against All Defendants)**

161. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

162. Defendants retaliated against Plaintiff for engaging in protected activity, by, *inter alia*, subjecting her to disparate treatment and terminating her employment.

**ANSWER:** The firm denies the allegations in Paragraph 162 of the FAC.

163. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 163 of the FAC.

164. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 164 of the FAC.

165. Defendant's unlawful retaliatory actions constitute malicious, willful and wanton violations of § 1981 for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** The firm denies the allegations in Paragraph 165 of the FAC.

**THIRD CAUSE OF ACTION**
**Discrimination in Violation of Title VII**
**(Against All Defendants)**

166. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

167. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, subjecting Plaintiff to disparate treatment.

**ANSWER:** The firm denies the allegations in Paragraph 167 of the FAC.

168. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, creating a hostile work environment for Plaintiff.

**ANSWER:** The firm denies the allegations in Paragraph 168 of the FAC.

169. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 169 of the FAC.

170. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 170 of the FAC.

171. Plaintiff is entitled to any and all other available remedies and/or damages, including but not limited to punitive damages and attorneys' fees and expenses.

**ANSWER:** The firm denies the allegations in Paragraph 171 of the FAC.

**FOURTH CAUSE OF ACTION**
**Retaliation in Violation of Title VII**
**(Against All Defendants)**

172. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

173. Defendants retaliated against Plaintiff for engaging in protected activity, by, *inter alia*, subjecting her to disparate treatment and terminating her employment.

**ANSWER:** The firm denies the allegations in Paragraph 173 of the FAC.

174. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 174 of the FAC.

175. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 175 of the FAC.

176. Plaintiff is entitled to any and all other available remedies and/or damages, including but not limited to punitive damages and attorneys' fees and expenses.

**ANSWER:** The firm denies the allegations in Paragraph 176 of the FAC.

**FIFTH CAUSE OF ACTION**
**Discrimination in Violation of the Florida Civil Rights Act**
**(Against All Defendants)**

177. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

178. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, subjecting Plaintiff to disparate treatment.

**ANSWER:** The firm denies the allegations in Paragraph 178 of the FAC.

179. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, creating a hostile work environment for Plaintiff.

**ANSWER:** The firm denies the allegations in Paragraph 179 of the FAC.

180. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of FCRA, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 180 of the FAC.

181. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of FCRA, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 181 of the FAC.

182. Plaintiff is entitled to any and all other available remedies and/or damages, including but not limited to punitive damages and attorneys' fees and expenses.

**ANSWER:** The firm denies the allegations in Paragraph 182 of the FAC.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of the Florida Civil Rights Act**
**(Against All Defendants)**

183. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

184. As described herein, Defendant retaliated against Plaintiff because of her race, by, *inter alia,* subjecting Plaintiff to disparate treatment and terminating her employment.

**ANSWER:** The firm denies the allegations in Paragraph 184 of the FAC.

185. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of FCRA, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 185 of the FAC.

186. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of FCRA, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 186 of the FAC.

187. Plaintiff is entitled to any and all other available remedies and/or damages, including but not limited to punitive damages and attorneys' fees and expenses.

**ANSWER:** The firm denies the allegations in Paragraph 187 of the FAC.

**SEVENTH CAUSE OF ACTION**
**Discrimination in Violation of the Illinois Human Rights Act**
**(Against All Defendants)**

188. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

189. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, subjecting Plaintiff to disparate treatment.

**ANSWER:** The firm denies the allegations in Paragraph 189 of the FAC.

190. As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, creating a hostile work environment for Plaintiff.

**ANSWER:** The firm denies the allegations in Paragraph 190 of the FAC.

191. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of IHRA, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 191 of the FAC.

192. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of IHRA, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 192 of the FAC.

Plaintiff is entitled to any and all other available remedies and/or damages, including but not limited to punitive damages and attorneys' fees and expenses.

**ANSWER:** The firm denies the allegations in the unnumbered paragraph following Paragraph 192 of the FAC.

**EIGHTH CAUSE OF ACTION**
**Retaliation in Violation of the Illinois Human Rights Act**
**(Against All Defendants)**

193. Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as if restated herein.

**ANSWER:** The firm incorporates by reference its answers to the foregoing paragraphs as if fully restated herein.

194. As described herein, Defendant retaliated against Plaintiff because of her race, by, *inter alia*, subjecting Plaintiff to disparate treatment and terminating her employment.

**ANSWER:** The firm denies the allegations in Paragraph 194 of the FAC.

195. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of IHRA, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 195 of the FAC.

196. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of IHRA, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

**ANSWER:** The firm denies the allegations in Paragraph 196 of the FAC.

197. Plaintiff is entitled to any and all other available remedies and/or damages, including but not limited to punitive damages and attorneys' fees and expenses.

**ANSWER:** The firm denies the allegations in Paragraph 197 of the FAC.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of Florida and the State of Illinois;

B. An injunction and order permanently restraining the Defendant and their officers, officials, agents, successors, employees and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein.

C. An injunction and order requiring the Defendants to take appropriate action to protect employees, prevent discrimination and provide avenues for prompt and immediate corrective action, with such measures to include, but not be limited to, the measures set forth above.

D. An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages.

E. An award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory

damages, including, but not limited to, compensation for emotional distress and/or mental anguish.

F. An award of punitive damages and any applicable penalties in an amount to be determined at trial.

G. Prejudgment interest on all amounts due.

H. An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law.

I. Reinstatement.

J. Such other and further relief as the Court may deem just and proper.

**ANSWER:** The firm admits that Ogedegbe seeks the relief identified in the WHEREFORE clause of the FAC, but denies all allegations set forth in each and every subparagraph of that clause, denies that it violated any statute or engaged in unlawful conduct, and denies that Ogedegbe is entitled to any type of remedy, relief, or damages whatsoever. The firm denies any remaining allegations in the WHEREFORE clause of the FAC.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

**ANSWER:** The firm admits that Ogedegbe demands a jury trial for all aspects of the case, but denies that Ogedegbe is entitled to a jury trial on all of her claims or to any other relief. The firm denies any remaining allegations in the JURY DEMAND of the FAC.

## GENERAL DENIAL

The firm denies each and every allegation in the FAC that is not expressly admitted in this Answer.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

1. Ogedegbe's claims are barred, in whole or in part, by the applicable statutes of limitations and/or are otherwise untimely.

2. Ogedegbe's Title VII and state law claims are barred to the extent that she failed to exhaust her administrative remedies.

3. Ogedegbe's Title VII and state law claims are barred to the extent they are beyond the scope of her underlying Charge(s) of Discrimination.

4. Ogedegbe's claims are barred because the firm exercised reasonable care to prevent and promptly correct any alleged unlawful conduct. To the extent Ogedegbe was obligated to do so, she unreasonably failed to take advantage of preventative or corrective opportunities or to avoid harm otherwise.

5. The firm acted at all times in good faith and consistently maintained, implemented, and enforced its policies against discrimination, harassment, and retaliation in the workplace and otherwise exercised reasonable care to prevent and promptly address any claims of discrimination, harassment and/or retaliation. To the extent Ogedegbe failed to exhaust internal remedies for her complaints of discrimination, harassment and/or retaliation, her claims are barred.

6. To the extent Ogedegbe complained of misconduct at the firm, and to the extent the firm was obligated to do so, the firm promptly and thoroughly investigated Ogedegbe's complaints and promptly took appropriate corrective action.

7. To the extent Ogedegbe is entitled to any damages, which the firm denies that she is, she has failed to mitigate her damages by, inter alia, turning down comparable work.

8. Ogedegbe's damages are limited or barred to the extent there is evidence after the fact, which amounts to independent grounds for the firm's decisions made or actions taken regarding Ogedegbe.

9. To the extent Ogedegbe seeks punitive damages, such damages are barred as because, at all relevant times, the firm acted reasonably and in a good faith effort to comply with all applicable laws, and it did not act with malice or reckless indifference to Ogedegbe's legally protected rights.

**WHEREFORE**, McDermott Will & Schulte LLP respectfully requests that this Court:

1. Dismiss Ogedegbe's FAC with prejudice and enter judgment in favor of the firm; and

2. Award the firm its costs, including reasonable attorneys' fees and such other relief as this Court may deem just and appropriate.

**MORGAN, LEWIS & BOCKIUS LLP**

Dated: December 18, 2025

*/s/* Jill Vorobiev
Jill Vorobiev, Bar No. 6237734
110 North Wacker Drive
Chicago, IL 60606-1511
Telephone: +1.312.324.1000
Facsimile: +1.312.324.1001
jill.vorobiev@morganlewis.com

Grace Speights, Admitted Pro Hac Vice
1111 Pennsylvania Avenue, NW
Washington, DC 20004-25441
Telephone: +1.202.739.5189
Facsimile: +202.739.3001
Grace.speights@morganlewis.com

*Attorneys for Defendant McDermott Will & Schulte LLP*